Jeffrey Todd MARTIN, by and through his next of friend and Personal Representative, David J. Martin, and Melvin Burrows, II, by and through his next of friend and Personal Representative, Melvin Burrows, Plaintiff,

v.

**The UNITED STATES of America, Defendant.**

**No. Civ–77–363–PHX–CAM.**

United States District Court, D. Arizona.

May 8, 1979.

Charles M. Brewer, Stuart J. Reilly, Phoenix, Ariz., for plaintiff.

Michael A. Johns, Asst. U. S. Atty., Phoenix, Ariz., for defendant.

## OPINION

JAMES M. BURNS, District Judge:

This is a Federal Tort Claims case, 28 U.S.C. §§ 1346, 2674, tried in the District of Arizona while I was sitting there, by assignment, in February. On February 14, 1979, by oral opinion, I found in favor of plaintiffs on the issue of the government's negligence; in addition, I found against the government on the issue of contributory negligence. Liability having been established, I requested the parties to submit post-trial memoranda concerning damages, so as to permit me to decide the damage issue upon my return to the District of Oregon.

█ The facts of this near-fatal accident are simple. Plaintiffs, each a grade school youngster, were riding home from school on a motorbike at about 6:00 P.M. on September 21, 1977, when they struck a sagging or "down" power line negligently maintained by the government. Plaintiff Jeffrey Martin was operating, and Plaintiff Melvin Burrows was a rear passenger on the bike.

Each suffered tragically severe and permanent injuries.[1] The damage elements are:

1) Past medical expenses, which are agreed;
2) Future medical expenses, also agreed, save for minor aspects;
3) Present value of lost future earning capacity;
4) Pain and suffering, and interference with normal and usual activities.

## I. MELVIN E. BURROWS II.

 Plaintiff Melvin E. Burrows II sustained severe burns to his face, head, back, buttocks, arms and legs.

### A. Past Medical Expenses

This plaintiff has submitted uncontested documentation of past medical expenses totalling $48,130.97.

### B. Future Medical Expenses

This plaintiff originally sought an award of $55,000 for future medical expenses based upon the testimony of Dr. Alan Sacks that each of 11 further contemplated plastic surgeries will cost about $3,000; that the operations should be performed at intervals of approximately six months; that hospital costs have doubled over the past five years; and that future cost increases will be about 12–15% per year. The defendant objected to plaintiff's suggestion that I take judicial notice of the asserted rate of inflation in hospital costs. Defendant also noted that the award could be immediately invested by the plaintiff to generate a return that would at least partially offset future medical care cost inflation. Following my letter of March 20, 1979, to the parties seeking clarification of this matter, the parties agreed to entry of an award for future

medical expenses of $48,629. In addition, I award $5,000 for psychological treatments to accompany Melvin's additional surgeries, as recommended by Dr. Aaron Canter, a clinical psychologist who treated Melvin during and after his stay at the Maricopa County Hospital.

### C. Loss of Earning Capacity

#### 1. Probable Earning Capacity Absent the Accident

Clarence Martin is principal of the Florence middle school, owner of a roofing business that employs Melvin Burrows' father, and uncle of the other plaintiff in this case. He testified upon the basis of his observation of Melvin during the seven years he has known him and the month and a half that Melvin had attended the middle school prior to the accident. He believed that Melvin was average or above average in intelligence and probably would have become a skilled worker, perhaps a mechanic or a carpenter. Dr. Glenn Wilt, an associate professor of finance at Arizona State University and an investment counselor, stated:

> [I]t can be reasonably presumed that, but for their injuries, both Melvin and Jeffrey would have gravitated into positions in one of the construction trades. Clearly, that is exactly what most of their uninjured classmates will do, and considering the general demand in this territory, due to the growth of population and need for attendant services in the construction field, a strong demand can be forecast for these jobs. Ex. 51B at 2.

Dr. David Yandell, a clinical psychologist and vocational rehabilitation counselor called by the defendant, testified that the intelligence and aptitude tests administered by Dr. Donald Guinoud show that Melvin

---

1. While my description of plaintiffs' injuries may seem clinical and detached, I did not view their plight without compassion. But it would serve little purpose to adorn this description with emotional adjectives. The parties, particularly the plaintiffs and their families, need no reminder from me that the injuries were tragic. And if this decision is appealed, the Court of Appeals will find ample evidence in the record, including several photographs and slides, to guide its deliberations. The record and the present appearance of these youths is testimony far more compelling and eloquent than I could presume to supply in the course of a written opinion. And my task, in any event, is to make an award based upon the facts, freed from inappropriate considerations such as sympathy, passion or prejudice. This I have tried to do. I believe I have succeeded.

could not have pursued a career in the skilled crafts but instead probably would have become a laborer. Defendant's other witness, Dr. John Buehler, chairman of the department of economics at the University of Arizona, expressed his opinion that neither plaintiff probably would have become a worker in the skilled trades, but rather each would have earned average wages.[2]

Based upon my evaluation of the testimony and the expertise and credibility of the witnesses, I conclude that Melvin Burrows probably would have become a skilled worker. Dr. Wilt stated that a carpenter would, at 1978 wage rates, earn about $9,450 per year during a four-year apprenticeship and during a subsequent 42-year career as a journeyman carpenter would earn about $18,900 annually in wages and $3,900 annually in fringe benefits. I accept these figures as reasonable approximations of Melvin's lifetime earnings had he not experienced this accident.

### 2. Probable Earning Capacity

■ Dr. Guinourd testified that Melvin might be employable as a night watchman or night diesel mechanic not involved with the public interaction aspect of either business. Dr. Wilt concluded that, because of Melvin's disfigurement and intolerance to sunlight and perspiration, he would probably be unable to find a job suited to his handicap. Dr. Canter testified that Melvin would benefit psychologically from working even at a lowly position.

Based upon the testimony and my own observation of Melvin Burrows, I conclude that he probably will be able to work at an entry-level position for at least half of his normal working life. According to Dr. Wilt, such work would generate an annual income of $3,120 in 1978 dollars. Thus, Melvin is entitled to recover in 1978 dollars $6,330 per year for four years (apprenticeship period), then $19,680 per year for the following 42 years (journeyman period).

### 3. Inflation Rate and Return on Investment [3]

Dr. Wilt testified that it is reasonable to expect an annual wage inflation rate of 7%

---

**2.** Plaintiff Burrows was born November 30, 1963; thus, he was 12 years old and an eighth grader at the time of the accident. Plaintiff Martin was born June 3, 1963, and thus was 13 years old and an eighth grader. Neither, therefore, has had any work history, making it necessary for damages purposes to predict what each plaintiff's future earnings would have been if the accident hadn't happened. Prediction also is necessary as to actual future earnings in light of the disabilities suffered from the accident. Neither side suggested that either plaintiff would likely become a member of the professions or work in a managerial or entrepreneurial capacity. Thus, each side, in submitting opinions as to the vocational future of the plaintiffs, assumed that each would enter the workforce at 19, upon completion of high school. Plaintiffs' experts, in predicting a skilled worker future, assumed a four-year apprenticeship period, with, thereafter, a 42-year journeyman career—in effect, assuming retirement from the workforce at age 65. Defendant's expert made similar assumptions, except that defendant did not agree that either plaintiff would have become a member of a skilled craft.

**3.** Each side recognized, of course, the necessity to reduce to present value the projected stream of lost future earnings. The method may be stated simply. The estimator (fact finder) must predict what inflation will occur in the wage rate during the working lifetime of each plaintiff and what return (or interest) could be earned from investment of the lump sum award over that same period. The fact finder then must calculate the amount of an award that would return a stream of earnings over the plaintiff's working lifetime equal to the amount of earnings that the plaintiff will lose over that period as a result of his injury. In simple, non-expert lingo, the higher the assumed rate of investment return (interest) compared to the assumed rate of wage inflation, the lower is the present lump-sum amount of the award. Conversely, the lower the assumed rate of investment return (interest) compared to the assumed rate of wage inflation, the higher is the present lump-sum amount of the award. If the assumed interest rate is equal to the assumed wage inflation rate, then no adjustment to ascertain present value is necessary. It is not entirely surprising, therefore that plaintiffs' experts expressed opinions calling for the use of factors producing large present-day amounts, and that defendant's experts expressed opinions calling for the use of factors producing small present-day amounts.

For example, if an injured plaintiff would have earned $15,000 in 1979 but because of his

over Melvin's working lifetime and that a sum of money in the hundreds of thousands of dollars could earn 7% annually in relatively riskless investments. Dr. Buehler, on the other hand, stated that wages should be expected to increase only 5.5% annually over this period and that the award could presently be invested with essentially no risk yet earn more than 9% annually.

I find that the award can presently be invested at very little risk and return 7.5% compounded annually. I find that 5.5% is a reasonable annual rate of wage inflation to be expected during Melvin's working lifetime.

### 4. *Amount of the Award*

I award an amount for the loss of Melvin's earning capacity sufficient when invested at a 7.5% annual rate of return to generate in 1978 dollars $6,330 per year for the four years 1983–86 (hypothetical apprenticeship period) and $19,680 per year for the following 42 years 1987–2028 (hypothetical journeyman period). These amounts in 1978 dollars are to be converted to current dollars for each year by application of a 5.5% expected annual rate of wage inflation, then discounted at 7.5% per year back to 1979. By this method of calculation, the award for loss of Melvin's earning capacity amounts to $548,029.

### D. *Pain and Suffering*

■ The power line struck Melvin on the face, head and perhaps also on the back, causing severe and extensive burns on those areas and on "blowout holes" on his but-

tocks, legs, left arm and right hand, where the electric current left his body seeking the ground. More than 80% of his head and face was burned, 70% to the third degree or worse. He also suffered third degree burns on 40% of his back, on his entire left buttocks and on at least six blowout ulcers. Melvin regained consciousness soon after the accident and was found wandering in the desert near the scene. Dr. Williams Clemans, a general practitioner in Florence, treated Melvin briefly in the back of a pickup truck outside the local hospital before having him sent to the burn treatment unit at the Maricopa County Hospital in Phoenix. Dr. Clemans testified that Melvin appeared to be in critical condition. He doubted whether Melvin would survive long enough to reach the burn unit.

At the Maricopa County Hospital where Melvin remained for four months, the surgeons removed the charred layers of skin and tissue from Melvin's face, head, buttocks and other areas of his body. They performed numerous skin grafts and attempted to fashion a functioning right eyelid, which Melvin still cannot close. Melvin lost his right ear entirely and the top third of his left ear. To graft skin onto his left temple, which had been burned down to the skull, the doctors ground the skull down to granulation tissue that could accept a graft. Restoring hair growth to this area would require an additional series of scalp rotation operations. The operations have left Melvin's face and scalp severely scarred, his mouth permanently contorted into a sneer. Because his facial nerves and muscles have

---

injuries could earn only $5,000, the proper award for lost 1979 earnings would be $10,000. If this pattern of lost earning capacity (10,000 1979 dollars per year) were projected to the year 1999 under an assumption that wage inflation would be 5% per year over the intervening 20-year period, the plaintiff's lost income during the year 1999 would be $26,533—in 1999 dollars. Under an assumption that the plaintiff could invest his award received in 1979 at a rate of 8% compounded annually, the proper award in 1979 to compensate the plaintiff for his projected loss of income during 1999 would be $5,693. If, on the other hand, the annual rate of wage inflation were assumed to be 8% and the assumed investment return 5%, the

proper award to cover lost 1999 earnings would be $17,567. If the assumed rates of wage inflation and investment return were both the same (both 5% or both 8%, etc.), the proper award for lost 1999 earnings would be $10,000.

Computation of the award for each plaintiff requires discounting to present value the amount of income that each will lose during each year of their assumed working lifetimes. For each of these plaintiffs, the award for lost earning capacity is the present 1979 value of the income he will forego during the 46 years from 1983 to 2028 under the assumption of a 5.5% annual rate of wage inflation and a 7.5% annual rate of investment return (compound interest).

been burned away, even additional surgery will never restore to him the ability to smile.

Of the expected eleven future operations, Melvin will undergo eight additional operations to his face. Skin grafts not infrequently dry out, crack, become infected and ulcerated and must be replaced by new grafts. Sunlight darkens grafted skin permanently, highlighting the injured area. Grafted areas are also more susceptible to skin cancer than normal tissue. Melvin testified that the grafted areas hurt and itch constantly. Dr. Sacks testified that additional plastic surgeries and skin grafts will not restore a normal appearance to Melvin.

Melvin has suffered psychologically as well as physically. At the burn unit Dr. Canter treated Melvin by hypnosis to relieve pain, prevent regurgitation of food and restore a will to live. Since emerging from the hospital Melvin has faced teasing and ridicule from his peers and startle reactions and revulsion from strangers.

For several months Melvin wore a mask to protect his healing face from further injury. His schoolmates labeled him "Maskatron." During a school outing children from another school saw him and ran away in horror. Strangers often ask, "What happened to you?" Clarence Martin testified that Melvin has become reclusive, reluctant to attend school. Dr. Canter stated that Melvin has become somewhat detached from life, blames himself for his father's heart trouble and may develop schizophrenic tendencies as a result of his injuries. Nor is it likely that Melvin will have a normal social or sexual life, given the severity of the injuries.

Based upon the testimony and my own observation of Melvin, I award $1,000,000 in compensation for pain and suffering.

## II. JEFFREY T. MARTIN.

Plaintiff Jeffrey T. Martin sustained severe burns to his right hand and arm, necessitating amputation of the arm at the shoulder. He also sustained severe burns to his back, buttocks and legs.

### A. *Past Medical Expenses*

This plaintiff has submitted uncontested documentation of past medical expenses totaling $15,384.38.

### B. *Future Medical Expenses*

■ The defendant has not contested this plaintiff's request for $30,000 to cover the cost of surgery and equipment necessary to provide Jeffrey a workable prosthetic arm.

### C. *Loss of Earning Capacity*

#### 1. *Probable Earning Capacity Absent the Accident*

Clarence Martin testified that Jeffrey, but for the accident, would probably have become a skilled laborer. The tests administered by Jeffrey's school and by Dr. Guinourd show him to be of average intelligence with an inclination toward outdoor and artistic occupations. Dr. Wilt stated that "it can be reasonably presumed that, but for [his] injuries, . . . Jeffrey would have gravitated into [a] position in one of the construction trades." Dr. Yandell testified that Jeffrey's test scores did not indicate an aptitude for the skilled crafts. Dr. Buehler's opinion was that Jeffrey would not have become a skilled tradesman.

Based upon my evaluation of the testimony and the expertise and credibility of the witnesses, I conclude that Jeffrey Martin probably would have become a skilled worker. I accept the earnings estimates provided by Dr. Wilt (in 1978 dollars $9,450 per year for a four-year apprenticeship and a total of $22,800 annually in wages and fringe benefits for a 42-year journeyman period) as reasonable approximations of Jeffrey's lifetime earnings had he not experienced this accident.

#### 2. *Probable Earning Capacity*

■ Like Melvin, Jeffrey cannot pursue outdoor occupations because of the sensitivity of the burned areas of his body to sunlight and perspiration. Jeffrey has considered a career in forestry, landscaping or

surveying, but Dr. Guinourd concluded that such occupations would be beyond the reach of a one-armed person, as would mechanical drafting, an artistic type of occupation consistent with Jeffrey's interests but requiring the use of both hands. He might be able to function as an attendant or clerk in a gas station or sporting goods store, but his handicap would prevent him from performing complicated repair work or from stocking shelves with heavy items.

I find that Jeffrey Martin probably will be able to work at an entry-level position with regularity throughout his normal working life. According to Dr. Wilt, such work would generate an annual income of $6,240 in 1978 dollars. Thus, Jeffrey is entitled to recover in 1978 dollars $3,210 per year for four years (apprenticeship period), then $16,560 per year for the following 42 years (journeyman period).

### 3. *Inflation and Return on Investment*

Again, I find that the award can presently be invested at very little risk and return 7.5% annually, and that 5.5% is a reasonable annual rate of wage inflation to be expected during Jeffrey's working lifetime.

### 4. *Amount of the Award*

I award an amount for the loss of Jeffrey's earning capacity sufficient when invested at a 7.5% annual rate of return to generate in 1978 dollars $3,120 per year for the four years 1983–86 (hypothetical apprenticeship period) and $16,560 per year for the following 42 years 1987–2028 (hypothetical journeyman period). These amounts in 1978 dollars are to be converted to current dollars for each year by application of a 5.5% expected annual rate of wage inflation, then discounted at 7.5% per year back to 1979. By this method of calculation, the award for loss of Jeffrey's earning capacity amounts to $453,088.

### D. *Pain and Suffering*

■ The power line struck Jeffrey's right hand and arm and probably his back. It caused severe and extensive burns on those areas and on "blowout holes" on his buttocks and legs. His dominant right arm was so severely burned that it had to be amputated at the shoulder three days after the accident in order to prevent the onset of gangrene. More than 30% of his back was burned to the third degree. About one-quarter of the rest of his torso received second degree burns. Third degree burns covered about 12% of his left thigh and right rear thigh; an additional 12% of his left thigh and 12% of his right thigh received second degree burns. More than half of his left buttocks sustained second degree burnings. Jeffrey lost consciousness only momentarily after the accident. He futilely attempted to restart the motorcycle before walking toward a nearby residence for help.

Dr. Clemans, who treated Jeffrey briefly at the local hospital before having him sent to the burn treatment unit at the Maricopa County Hospital in Phoenix, testified that Jeffrey's arm was white and his fingers looked like bananas. Dr. Sacks testified that Jeffrey's arm was slit open to relieve the tension caused by swelling. The doctors performed a tracheotomy to permit breathing and skin grafts on the burned areas of his body. During his 31-day stay at the hospital, Jeffrey required frequent painful changes of dressings that necessitated chemical sedation. He was later fitted with a prosthetic right arm but can maneuver this device only by moving his left arm. Dr. Sacks has suggested grafting some bone and muscle to Jeffrey's right shoulder to make it possible for him to use a different type of prosthesis. He does not now often wear the prosthesis, because of pain and lack of usefulness.

Jeffrey testified that the burned areas of his body are painful and itch most of the time. Formerly active in outdoor sports and outside work around the home, Jeffrey now must avoid sunlight that will permanently darken the grafted areas and cause painful perspiration. He suffers "phantom pain" from the absence of his right arm. His clumsy prosthetic arm hurts his shoulder. Jeffrey has learned to write with his left hand but cannot wash his own left arm

or help out as much around the home as before. He can no longer play baseball but did play on the school football team during the year following the accident and has also taken up soccer.

Despite his remaining activities, Jeffrey has certainly suffered psychological as well as physical injury. Dr. Guinourd's interview of Jeffrey's family revealed their belief that he has become harder to get along with and has developed a shorter temper since the accident. Dr. Guinourd testified that Jeffrey has tendencies to become withdrawn, upset, nervous, apprehensive and self-reproaching. Jeffrey testified that others of his age have called him a "one-armed punk."

Based upon the testimony and my own observation of Jeffrey, I award $750,000.00 in compensation for pain and suffering.

SUMMARY:

I find that the plaintiffs are entitled to awards as follows:

| | BURROWS | MARTIN |
|---|---|---|
| Past Medical | $ 48,130.97 | $ 15,384.38 |
| Future Medical | 53,629.00 | 30,000.00 |
| Loss of Earning Capacity | 548,029.00 | 453,088.00 |
| Pain and Suffering | 1,000,000.00 | 750,000.00 |
| Total | $1,649,788.97 | $1,248,472.38 |

The foregoing shall constitute findings of fact and conclusions pursuant to Rule 52, Fed.R.Civ.P., together with earlier findings and conclusions set out in my oral opinion on February 14, 1979.