BRUCE D. HARRIS, Plaintiff-Appellee, *v.* GERALD W. DAY, Defendant-Appellant.

Fourth District No. 4—82—0167

Opinion filed June 21, 1983.

764

Costigan & Wollrab, of Bloomington (James C. Wollrab and Dean M. Davis, of counsel), for appellant.

Robert J. Lenz, of Bloomington, for appellee.

JUSTICE TRAPP delivered the opinion of the court:

Defendant, Gerald Day, appeals from a judgment entered on a jury verdict finding for plaintiff, Bruce Harris, and awarding damages of $16,000 in his suit for recovery of personal injuries. We affirm.

On the afternoon of May 15, 1973, plaintiff, age 14, was playing tennis with a friend, Jay Allen, on tennis courts which were bordered on the north by Gregory Street, a four-lane road in Normal. Gregory carries east-west traffic and is divided by a three-foot median. During the match Allen hit a tennis ball over the fence and it landed on Gregory Street. Plaintiff went into the street to retrieve the ball and was struck on the hip and knee by defendant's auto which was east-bound on Gregory. Only the parties to this suit observed the event, and needless to say their testimony differs.

The plaintiff testified that as he left the courts, he noticed a car traveling on Gregory Street some 600 to 700 feet away. He crossed the sidewalk and trotted to the center line of the two eastbound lanes where the ball was located. While bent over he heard the sound of a car, froze for a second, turned around, and saw the car several feet away. He tried to jump out of the way, but was struck by the right front corner of the defendant's auto in the southernmost, eastbound lane.

Defendant testified that he was driving his vehicle towards Main

Street on Gregory and that he was in the southerly lane of the portion of the road for eastbound traffic. He stated that his car was 100 to 150 feet from plaintiff when he first saw the plaintiff and estimated his car may have been traveling at approximately 25 miles per hour but not over 30 miles per hour. When he first saw plaintiff, plaintiff was trotting at approximately jogging speed into the street. He went over to within at least two or three feet of the concrete median and at that point leaned over to pick up the tennis ball. This was in the northern portion of the two eastbound lanes, and closer to the median than the center of the eastbound lanes. When defendant first saw plaintiff coming out in the street, defendant applied his brakes and testified he slowed down to perhaps 20 miles per hour. Plaintiff picked up the tennis ball with his back toward defendant, and then turned around and looked at defendant's car. Defendant then took his foot off the brake because plaintiff was stationary. Defendant thought plaintiff had seen him and would wait until defendant has passed. Defendant testified that plaintiff remained motionless for an instant and then began running back across the street to the curb. Defendant slammed on his brakes, leaving skid marks approximately 40 feet long but was unable to avoid a collision. Defendant testified that he was unable to swerve or honk his horn because there just wasn't time.

The collision threw plaintiff into the grassy portion of the shoulder. Plaintiff testified that his leg swelled up to fill his sweat pants and felt as if it were on fire. Plaintiff's leg was immobilized by ambulance personnel, and he was taken to Brokaw Hospital in Normal where he received three or four stitches and remained for five days. When he left the hospital he was on crutches and spent a week in physical therapy. He could not get out of bed for two or three days after leaving the hospital and remained on crutches for approximately three weeks after leaving the hospital. He did, however, go back to school and was able to finish his freshman year in high school.

Plaintiff began his sophomore year in the fall of 1973 and went out for the football team after Dr. Lyman, his treating physician, gave him a physical examination which was required for participation. No X rays or tests were done on the knee, but plaintiff told the doctor that the knee was stiff. In late summer practices, which were double sessions, plaintiff's knee was hit. It was sore for a couple of days, and he then returned to practice. Plaintiff practiced with the team two to 2½ months that fall, but ultimately quit because he could not keep up.

In April 1975, plaintiff was involved in an automobile accident when his car slid on ice and collided with another vehicle. He received

a concussion but, according to plaintiff, neither his right leg nor any part of his lower body was injured. Although plaintiff testified that there were no lower body injuries, Dr. Van Ness testified that plaintiff received ultrasound treatments on his knee following the accident. The doctor did not specify which knee received the treatment, and plaintiff attempted to impeach the doctor's refreshed collections since the records upon which he relied did not state which part of the body received the ultrasound. Defendant then impeached plaintiff's testimony that his legs were not injured in this automobile accident with his pretrial deposition in which he stated that he was in an accident on April 3, 1975, and received injury to his right knee and leg.

In addition to the above incidents, plaintiff testified that his knee had gone out more than 20 times since the accident in May of 1973. These incidents caused pain, limping and sometimes required the use of crutches. In late September of 1975, plaintiff had an operation on his knee because it kept going out, causing severe inconvenience by its persistent interruptions of his day-to-day life. The operation was performed by Dr. Terry Noonan, who removed some cartilage and tightened his ligaments. He was in the hospital for about a week, then remained at home for about a week and one-half before going back to school.

Dr. Terry Noonan, an orthopedic surgeon, testified that he examined plaintiff on September 3, 1975, in relation to what plaintiff told him was an unstable knee caused when he was hit by a car in 1973. Noonan X-rayed, observed, and manipulated the knee and found that there was abnormal movement of the knee from side to side, apparently because of an old injury to a knee ligament. There was also an abnormal forward movement when the leg was twisted outwards, and some calcification in the knee. These conditions observed in plaintiff's right knee appeared to have been the result of a traumatic injury. On cross-examination, Noonan testified that plaintiff did not inform Noonan of the automobile accident he was involved in earlier in 1975, nor that plaintiff had broken his left leg while playing basketball in the spring of 1974. Noonan testified that if the right knee was also injured in an accident in April 1975, as well as May of 1973, he would not be able to tell which accident caused the conditions in the knee which he observed in his examination in September of 1975. Noonan examined plaintiff several times subsequent to the operation. In November of 1978, Noonan noted some early arthritic changes in the knee which might be expected to be progressive in nature and which could become painful. Based on his examinations of plaintiff, Noonan believed that plaintiff would suffer pain in the future, would need

medical care based on intermittent discomfort, and could possibly need additional reconstructive surgery. He was of the opinion that the instability in plaintiff's knee and his arthritis would be permanent.

Another orthopedic surgeon, Dr. Gerald Bratberg, examined plaintiff for the first time in March of 1981. He testified that the injury to the knee was traumatic in origin, and that it resulted from an injury rather than being a congenital problem, or a problem occurring from normal wear. Bratberg stated that the only history of plaintiff's knee related to him was that plaintiff was struck by a car as a child. He was not told of any other injuries. He stated that he would have no way of knowing what caused the onset of the knee condition but would not expect a knee injury of this kind to result from merely slipping and falling on a knee while engaged in normal activity. The injury found would usually require a severe blow to the outside part of the knee. Bratberg also removed some torn cartilage from plaintiff's knee in 1981. He was of the opinion that plaintiff would suffer pain in his right knee in the future and that the looseness of his ligaments, and arthritis were permanent conditions.

On the issue of damages, Professor Alan Dillingham, a labor economist and head of the economics department at Illinois State University, testified regarding the present value of future earnings for plaintiff. He did this using the minimum wage of $3.35 per hour and the assumption that this minimum wage would increase at 6.2% per year, compounded annually, since this rate of increase was the average annual rate the minimum wage had increased since its inception in 1938. He testified that the expected work life for a 23-year-old male would be approximately 39 years, and that the average working period per year for a full-time American worker would be 50 to 52 weeks. Assuming a five-week work loss per year by an unskilled laborer, it could be expected that such a laborer would lose about 15% of his income through his work life. Dillingham testified that the present value of lifetime earnings for a 23-year-old male at the minimum wage under the assumption that it would increase at 6.2% per year would be $119,841. Present value of the future lost earnings for a 23-year-old male who loses 10% of his work per year throughout his work life is $17,976. Medical bills of approximately $3,000 were also admitted into evidence.

Defendant's first argument on appeal is that the jury's verdict is against the manifest weight of the evidence, primarily for the reason that the evidence fails to disclose that defendant was not exercising due care. Since this case was tried subsequent to our supreme court's decision in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886, the fact

that plaintiff was partially at fault would not require a reversal of the jury's verdict.

■■■ Verdicts and judgments are not against the manifest weight of the evidence unless a conclusion contrary to the jury's is clearly evident, plain, and indisputable. (*Didier v. Jones* (1978), 61 Ill. App. 3d 22, 377 N.E.2d 572.) Where there is a conflict in the testimony, we will not substitute our judgment for that of the trier of fact whose function it is to determine the credibility of the witness' testimony, and the inferences to be drawn from that testimony. We cannot say that the opposite conclusion is clearly evident. Defendant could have been found negligent for failing to comply with section 11—1103(c) of the Illinois Vehicle Code which provides, in part, that:

> "[E]very driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway and shall give warning by sounding the horn when necessary and shall exercise proper precaution upon observing any child *** upon a roadway." (Ill. Rev. Stat. 1973, ch. 95½, par. 11—1003(c).)

The jury could have found that the defendant was negligent for failing to keep a proper lookout when he did not see plaintiff until he was 100 to 150 feet away although there was an unobstructed view for 600 to 700 feet between them, and the jury was not required to accept defendant's testimony that he was not exceeding the maximum speed limit. The physical evidence of tire marks longer than 40 feet is not necessarily consistent with defendant's that he slowed his car to 20 miles an hour. The jury could also have found that defendant's failure to take evasive action, sound his horn, or slow down was, under the circumstances, unreasonable.

Defendant next argues that the trial court erred in failing to direct a verdict at the close of plaintiff's case because the evidence would never support a finding that defendant breached a duty, or that this breach was the proximate cause of plaintiff's ongoing knee problems. We disagree.

The often-cited decision of *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, sets forth the applicable standards for directing verdicts and entering judgments *n.o.v.*

> "[V]erdicts ought to be directed and judgments *n.o.v.* entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.

What we have previously said with reference to the proof of defendant's breach of duty will suffice to answer defendant's argu-

ment on this issue.

■ We must consider plaintiff's proof of causation. The general rule regarding proof necessary to make a *prima facie* case of proximate cause in a negligence case alleging personal injuries is that medical testimony is not required to prove a causal connection between the defendant's act or omission and plaintiff's injuries where the connection is clearly apparent from the illness and the circumstances attending it. (*Jackson v. Navik* (1976), 37 Ill. App. 3d 88, 346 N.E.2d 116; *Hyatt v. Cox* (1965), 57 Ill. App. 2d 293, 206 N.E.2d 260.) As this court noted in *Hyatt*, however:

> "Where the injury complained of is remote in time from the accident or the condition is one that is shrouded in controversy as to origin, such as the intervention of either a prior or subsequent injury or disease, layman testimony may be insufficient to establish a prima facie showing of a causal relationship." (57 Ill. App. 2d 293, 299, 206 N.E.2d 260, 263.)

Defendant's argument here is that in light of plaintiff's subsequent injuries to his knee, medical evidence of causation was necessary and lacking in plaintiff's case in chief. We agree with the defendant's proposition but not with his application.

■ ■ Although no doctor testified that the accident in May of 1973 was the cause of all of plaintiff's problems, the doctors did testify that plaintiff's condition was of traumatic origin and that the injury would have required severe impact such as occurred in the accident. Coupled with plaintiff's testimony of the events surrounding the accident and this medical testimony, we are not persuaded that plaintiff failed to establish a *prima facie* case with respect to the proof of causation. Proof that the accident was the sole cause of plaintiff's knee problem is not necessary so long as plaintiff presents proof that the original trauma was a substantial factor in producing the complained of injuries. *Stephenson v. Air Products & Chemicals, Inc.* (1969), 114 Ill. App. 2d 124, 252 N.E.2d 366; Annot., *Proximate Cause: Liability of Tortfeasor For Injured Person's Subsequent Injury or Reinjury*, 31 A.L.R.3d 1000, 1004 (1970).

■ In this connection we note that defendant did not tender any instructions requiring the jury to determine whether the subsequent reinjuries were caused by an intervening independent cause. The court is under no obligation to give instructions on its own motion (*City of Chicago v. Baird* (1971), 132 Ill. App. 2d 644, 270 N.E.2d 259), and if defendant's theory is that plaintiff's knee problems were caused by subsequent intervening causes, a proper instruction should have been submitted for consideration. (See *Dolan v. Crammond*

(1979), 71 Ill. App. 3d 289, 389 N.E.2d 206.) Plaintiff's proof of causation was sufficient to create a question of fact to be resolved by the jury. Moreover, the rule is well settled that a tortfeasor can be held liable for subsequent injuries or reinjuries which result as a normal consequence of the original tortfeasor's negligence. (*Stephenson*; Restatement (Second) of Torts sec. 460 (2d ed. 1965); *cf. Bak v. Burlington Northern, Inc.* (1981), 93 Ill. App. 3d 269, 417 N.E.2d 148.) A statement of the rule is set out in section 460 of the Restatement (Second) of Torts, which provides:

"If the negligent actor is liable for an injury which impairs the physical condition of another's body, the actor is also liable for harm sustained in a subsequent accident which would not have occurred had the other's condition not been impaired, and which is a normal consequence of such impairment."

We conclude the trial court did not err in refusing to direct a verdict for defendant.

Defendant next urges error in the trial court's overruling of his objections to testimony from Professor Dillingham, who testified in reference to plaintiff's loss of future wages. On appeal, defendant argues that plaintiff presented an insufficient foundation to justify testimony of lost future wages. Additionally, defendant argues that an instruction allowing the jury to assess lost future wages was improper. Defendant's arguments relating to the inadequacy of the foundation for Dillingham's testimony is essentially that the expert based his opinion on assumptions not substantiated in the record, particularly the assumption that plaintiff's knee would result in a work loss of five weeks per year and that plaintiff would earn the minimum wage.

While an opinion of an expert should not be based upon numerous varying and uncertain factors (see *Boose v. Digate* (1969), 107 Ill. App. 2d 418, 246 N.E.2d 50; E. Cleary & M. Graham, Handbook of Illinois Evidence sec. 611.25, at 332-33 (3d ed. 1979)), we note the equally well-settled rule that the assumptions suggested in a hypothetical question need not be undisputed but only supported by evidence in the record. (*Johns-Manville Products Corp. v. Industrial Com.* (1979), 78 Ill. 2d 171, 399 N.E.2d 606.) Evidence in the record, although in dispute, is not speculative and supports the use of a five-week work loss assumption. Plaintiff testified to an average work loss of six to eight weeks per year. The defendant's further suggestion that use of minimum wage as a wage rate for a high school graduate with two years of college education was improper is without merit.

Defendant also argues that there was no foundation to instruct

the jury to award lost future wages, since there was no evidence of ability, opportunity, intelligence or future vocation. Plaintiff's testimony, along with other evidence, indicates that plaintiff had been employed at Towanda Grain Company, Clark Aviation, the Normal Park Department, and as a summer farm worker. Plaintiff also introduced evidence of his high school and college education. We note the absence of specific wage figures, but this was undoubtedly due to the fact that plaintiff was still in school and had no defined career plans or full-time employment history.

■■ ■ A party is entitled to have the jury instructed on its theory of recovery so long as that theory is supported by the facts in evidence and reasonable inferences therefrom. (*Wallace v. Weinrich* (1980), 87 Ill. App. 3d 868, 409 N.E.2d 336.) The record contains evidence that plaintiff's injury was permanent and evidence that such injury would reduce plaintiff's employment options, and/or result in a loss of time from future employment. Plaintiff himself may testify that his injuries diminished his capacity to work, and the general rule is that the appearance of the plaintiff on the witness stand, his testimony as to the nature of his injuries and their duration is sufficient to take the question of impaired earning capacity to the jury. (*Bunch v. Rose* (1973), 10 Ill. App. 3d 198, 293 N.E.2d 8.) We conclude that there was sufficient evidence for the jury to arrive at a calculation for lost future wages without undue danger of speculation or conjecture. See *Arnett v. Thompson* (Ky. 1968), 433 S.W.2d 109; *Martin v. United States* (D. Ariz. 1979), 471 F. Supp. 6.

Defendant next objects to the submission to the jury of Illinois Pattern Jury Instruction (IPI), Civil, No. 70.03 (2d ed. 1971), the disputed portion of which incorporates section 11—1003(c) of the Illinois Vehicle Code (Ill. Rev. Stat. 1973, ch. 95½, par. 11—1003(c)), as follows:

> " 'Notwithstanding the foregoing provisions of this section every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian upon any roadway and shall give warning by sounding the horn when necessary *and shall exercise proper precaution upon observing any child or any obviously confused or incapacitated person upon a roadway.'* " (Emphasis added.)

■■ ■ We believe it was proper to give the instruction referring to a 14-year-old as a child, but agree with defendant that there is no evidence to support the suggestion that plaintiff was incapacitated. The word "incapacitated," in its ordinary denotation, refers to a physical disability. (Webster's New World Dictionary, Second College

Edition 709 (1980).) Instructions concerning violations of a statute should not be given unless the evidence is adequate to support a finding that a violation occurred (*Wallace*), and if a part of the statute is not supported by competent evidence in the case, the better practice is to delete such unsupported language. (*Nagelmiller v. Seibel* (1964), 47 Ill. App. 2d 39, 197 N.E.2d 457.) The portion of the instruction referring to incapacitated persons should have been deleted from the instruction, but such error is not prejudicial in light of the clear applicability of the duty to exercise proper precaution upon observation of a child. The jury could have found a violation of the statute because plaintiff was a child even though no evidence suggested incapacitation.

 Defendant next urges error in the refusal to submit his proposed special verdict form to the jury which would have required the jury to state the total damages and percentages of fault of each party in accordance with the supreme court's adoption of pure comparative negligence in *Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886. Defendant points out in support of his argument that in several States that have adopted pure comparative negligence, such special verdict forms are suggested and even required. (See *Placek v. City of Sterling Heights* (1979), 405 Mich. 638, 275 N.W.2d 511; *Lawrence v. Florida East Coast Ry. Co.* (Fla. 1977), 346 So. 2d 1012; *Li v. Yellow Cab Co.* (1975), 13 Cal. 3d 804, 532 P.2d 1226.) *Alvis* does not explicitly mandate such computational forms; and the verdict form given was in accord with IPI Civil No. A45.05 (1981 Supp.) which requires no finding by the jury of the percentage of fault or total damages. This court found no error in this form of instruction in *Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703.

The drafters of the jury instructions have also adopted computational verdict forms (IPI Civil Nos. A45.06, A45.07 (1981 Supp.)), but the comments suggest that such instructions need be given only when the court is desirous of learning the percentage of fault of the parties. This writer would require the computational verdict forms in all cases for the reasons listed in the *Lawrence* opinion of the Florida Supreme Court, but under the circumstances here, even assuming error in failing to give the computational form, such would not be prejudicial since the jury was adequately instructed on the doctrine of pure comparative negligence.

 Finally, defendant requests this court to order a *remittitur* for the reason that defendant believes the award of compensation shocks the conscience. We, however, decline to do so. We find applicable here the comments in *Lau v. West Towns Bus Co.* (1959), 16 Ill.

774

2d 442, 158 N.E.2d 63:

"We are not unmindful of our obligation to carefully scrutinize the record to determine whether the amount of the verdict is so large as to indicate passion and prejudice. This we have done, and we conclude from the evidence that although the verdict may well be in excess of the amount which the judges of this court would have allowed if they had heard the evidence and made the original determination, yet we do not believe that it is so excessive as to show passion or prejudice." 16 Ill. 2d 442, 453, 158 N.E.2d 63, 69.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

MILLS and GREEN, JJ., concur.