THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TYRONE JACKSON, Defendant-Appellant.

First District (2nd Division)   No. 1—89—1413

Opinion filed March 16, 1993.

Michael J. Pelletier and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Gael M. O'Brien, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SCARIANO delivered the opinion of the court:

Defendant Tyrone Jackson was arrested on February 24, 1987, and subsequently charged by indictment with one count of murder and one count of armed violence for events occurring on November 22, 1986. The State eventually nol-prossed the latter count, and a jury later found defendant guilty of the remaining offense of murder.

Keisha Young, Yvette Jones, Tyrell Walker, and Vivian Harris, all of whom were present at the scene of the crime, testified to the following version of the events occurring on the night of the homicide. On November 22, Harris and Walker hosted a birthday party at their

home, located at 15400 Oakley Court in Harvey, Illinois, for Jones and Harris. Only guests who had received an invitation were permitted to attend the "couples only" party at which food, alcohol and marijuana were available.

Sometime after the festivities had begun, Anthony Matthews[1] and Bruce Williams arrived at the party. Harris told them that they could not enter because the party was for invitees only; however, she informed them that they could join the gala if they returned with either "a date or a drink." About an hour later, Matthews and Williams returned with defendant,[2] Billy Sibley and another man named Ralph. Although the men brought alcohol with them, Harris still did not want to admit them because she "[didn't] want no trouble started." However, her boyfriend, Van Johnson, convinced her to allow them to join the party.

Shortly after the men were permitted in the house, Williams began arguing in the kitchen with Johnson's friend Kevin Kelly. Harris interceded, separating them temporarily, but soon thereafter the two men began quarrelling again. Although no punches were thrown, Williams and Kelly were shoving each other and exchanging obscenities. Harris finally had enough of the nonsense, so she told Williams that he would have to leave the party. Williams refused, however, and Harris was forced to push him out the back door.

While Harris was shoving Williams out the door, defendant and Matthews also proceeded outside, as did Kelly, Jones, Walker and a few other members of the party. Williams was still arguing with Harris and Kelly when Young went to awaken Johnson, who had fallen asleep on the couch, in order to inform him of the hostilities which were going on in the backyard. Johnson then went outside and tried to defuse the situation by imploring Williams, Matthews and defendant to leave peacefully so that the police would not break up the party. At this point, Young was standing in the doorway, Jones was standing outside just to the right of a cement step outside the door, Harris was just to her right, Johnson was standing in front of and between Jones and Harris, and Walker was a good distance to the left of the cement step.

While Williams was arguing with Harris and Johnson, Matthews, who had briefly left the backyard area, came running down Oakley

---

[1]At the time of the incident, all of the State's eyewitnesses knew Matthews only as "Tony Pimp."

[2]All of the occurrence witnesses stated that at the time of the incident, they knew defendant only as "Perch."

Court, the street adjacent to the yard, with a gun. As he was shouting "Ain't nobody going to fuck with my folks," and "What's up? Who's fucking with my roadie?" Matthews fired one shot into the air. He then passed the gun to Williams, who was standing between a couple of parked vehicles at a point about eight feet away from the crowd and who fired the weapon in the direction of Johnson, Harris and Jones. Harris and Walker testified that Williams fired one shot, but Jones stated that he fired two; in any event, one bullet struck Johnson in the foot, and as he stumbled for cover, Harris and Jones tried to help him walk. Williams then handed the gun to defendant, who approached to within six feet of Johnson and fired two bullets at him, one of which struck him in the neck. As the women dragged Johnson, who was bleeding profusely, into the house, defendant yelled "What's up now, motherfucker?" and then fled the scene in a car with Williams and Matthews.

After the assailants left the scene, Jones ran to a neighbor's house and called the police, who arrived a short time later. Johnson was taken to Ingalls Memorial Hospital, where he eventually died. Later that night at the police station, Harris identified, from an array of photographs, defendant, Williams and Matthews as the shooters; Jones identified only defendant and Matthews from that same array.

Assistant Cook County Medical Examiner Nancy Jones, M.D., testified that Johnson died as a result of massive bleeding caused by two gunshot wounds. She stated that Johnson had a through-and-through wound in his left foot and that the bullet had entered the inside of his foot, traveled upward, and then exited the top of his foot near his ankle. Dr. Jones opined that although it did not appear that the bullet caromed off the ground before entering Johnson's foot, the upward path of the bullet nonetheless could have been the result of a direct hit if the victim had his foot turned away from the shooter, or if he was walking, running or stumbling away from him at the time the shot was fired. She also testified that she could not positively state whether the bullet deflected upward off a bone in Johnson's foot after entry. The second bullet that struck Johnson entered the right side of his neck, traveled downward, severed his subclavian artery, pierced his left lung, deflected off one of his ribs, and exited near his left armpit.

The State rested after it called Dr. Jones; defendant presented no evidence in his own defense. The jury found defendant guilty of murder, and after hearing argument in aggravation and mitigation, the trial court sentenced him to 30 years in the custody of the Illinois De-

partment of Corrections to be followed by three years of mandatory supervised release.

I

Defendant claims that the evidence presented against him was insufficient to establish his guilt beyond a reasonable doubt. The standard of review applicable to insufficiency of the evidence claims is:

> "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citations.] The reviewing courts apply this standard regardless of whether the evidence is direct or circumstantial. [Citations.] This standard of review does not allow the appellate court to 'substitute its judgment for that of the fact finder on questions involving the weight of the evidence or the credibility of the witnesses [citation].' [Citation.] Therefore, [a reviewing] court will not reverse a criminal conviction unless the evidence is so 'unreasonable, improbable, or so unsatisfactory as to justify a reasonable doubt of the defendant's guilt [citation].' [Citation.]" *People v. Sutherland* (1992), 155 Ill. 2d 1, 17.

In the case at bar, defendant claims that he was not proven guilty beyond a reasonable doubt because: (1) the inconsistent testimony of the State's eyewitnesses regarding the number of shots fired and the position of Johnson's body when he was wounded rendered the evidence too improbable to sustain his conviction; and (2) the State failed to establish that defendant had any motive to kill Johnson. We find both of these arguments to be totally baseless.

Regarding defendant's first argument, it is axiomatic that it is the sole province of the jury to determine the credibility and weight of the witnesses' testimony and to resolve any conflicts therein. (*People v. Collins* (1985), 106 Ill. 2d 237, 261-62, 478 N.E.2d 267, 277; *People v. Manion* (1977), 67 Ill. 2d 564, 578, 367 N.E.2d 1313, 1320.) In this case, the jury heard the discrepancies in the witnesses' testimony of which defendant complains and resolved that conflict in favor of the State. Certainly, we cannot say that its determination was so unreasonable that no rational trier of fact could have similarly concluded. The fact that the occurrence witnesses disagreed about the number of shots fired by the attackers and the position of the victim when he was attacked does not even come close to rendering this verdict inappropriate. It was perfectly reasonable for the eyewitnesses to the murder to be a bit confused as to how many shots were fired and exactly how the victim collapsed, since they were scattering for cover

while defendant and Williams were pumping bullets at them from a distance of six to eight feet. More important, there was no inconsistency in the four eyewitnesses' testimony that defendant walked up to Johnson, shot him in the neck, and then shouted to him "What's up now, motherfucker?"

▪ Defendant's lack of motive argument is equally groundless. It is well established that "the State has no obligation to prove motive in order to sustain a conviction of murder." (See, *e.g., People v. Easley* (1992), 148 Ill. 2d 281, 326, 592 N.E.2d 1036, 1056.) In any event, the State in the case did present a motive for the offense to the jury, *i.e.*, that defendant was evicted from a party by the victim's girl friend (Harris) because one of his "roadies" (Williams) was involved in a heated argument with a friend of the victim (Kelly). The fact that defendant did not actually argue with the victim does not negate the plainly evident reason for this homicide.

Accordingly, we find that the jury properly determined that the State sufficiently established defendant's guilt beyond a reasonable doubt.

## II

Defendant next asserts that he should be granted a new trial because the trial court allowed the prosecutor to ask the State's expert witness, Dr. Jones, a hypothetical question which was not based on the evidence. We disagree. The colloquy of which defendant complains went as follows:

> "[Prosecutor:] First of all, before I have you demonstrate, I would like to ask you if a person is standing, walking, [or] running, and another shoots a gun downward, is there anything unusual about the bullet entering the side of the foot and comes out [*sic*] the top of the foot, as opposed to the bottom of the foot?
>
> [Defense Counsel:] Objection. That's not the facts here.
>
> [THE COURT:] Overruled.
>
> [The Witness:] If an individual is running or walking or lifting their [*sic*] foot in a process of running or walking, there is nothing inconsistent with a bullet entering and traveling upward.
>
> That's perfectly consistent, if the foot is up in back or up in front.
>
> It is possible for a bullet to enter on the medial aspect of the foot and travel upwards and exit on the top of the foot, as I have in this case."

Our supreme court has stated that where an expert witness is asked a hypothetical question based on certain assumptions, "[a]s long as the hypothetical assumptions are within the realm of circumstantial or direct evidence, as supported by the facts or reasonable inferences, the question is permissible." (*Guardian Electric Manufacturing Co. v. Industrial Comm'n* (1973), 53 Ill. 2d 530, 535, 293 N.E.2d 590, 594.) Furthermore, the assumptions suggested in a hypothetical question need not be undisputed but only supported by the record (*Harris v. Day* (1983), 115 Ill. App. 3d 762, 771, 451 N.E.2d 262, 267), and "[i]n presenting evidence by a hypothetical question, counsel propounding the question has a right to ask it, assuming only the facts as he perceives them to be shown by the evidence" (*Johns-Manville Products Corp. v. Industrial Comm'n* (1979), 78 Ill. 2d 171, 180, 399 N.E.2d 606, 611); opposing counsel may then challenge the controverted facts by presenting his own hypothetical questions to the witness on cross-examination. *Hebeler v. Industrial Comm'n* (1991), 207 Ill. App. 3d 391, 395, 565 N.E.2d 1035, 1037.

In the case *sub judice*, the prosecutor asked Dr. Jones to assume that Johnson was standing, walking or running when he was shot in the foot. The prosecutor's assumption that Johnson's feet were moving when he was shot by Williams was amply supported by the testimony that he was "stumbling," "slipp[ing]," and/or "fall[ing]" as he was being shot at. The facts here did not require the prosecutor to ask Dr. Jones to presume that Johnson was standing while he was being fired at from close range. We therefore find that the hypothetical question asked by the prosecutor was proper.

Furthermore, even were we to find that the trial court erred in allowing the prosecutor to ask the complained-of hypothetical question, the error was harmless beyond a reasonable doubt. (See *People v. Gacy* (1988), 125 Ill. 2d 117, 130-31, 530 N.E.2d 1340, 1345.) The question at issue here concerned the path of the bullet fired into Johnson's foot by Williams, which clearly did not tarnish the fact that four eyewitnesses observed defendant shoot Johnson in the side of the neck from point-blank range.

### III

Defendant's final contention is that this cause must be remanded for new post-trial proceedings because a conflict of interest arose between him and his trial counsel after he filed a complaint with the Attorney Registration and Disciplinary Commission (ARDC) against him following the jury's guilty verdict.

■ Our courts have invariably held that a *per se* conflict of interest between a defendant and his attorney is *not* created simply because the defendant claims that his representation was ineffective or because, as was done here, he files a complaint with the ARDC alleging the same. (*People v. Nitz* (1991), 143 Ill. 2d 82, 134, 572 N.E.2d 895, 919; *People v. Carroll* (1992), 260 Ill. App. 3d 319, 337-38; *People v. Dean* (1992), 226 Ill. App. 3d 465, 467, 589 N.E.2d 888, 890; *People v. Jackson* (1985), 131 Ill. App. 3d 128, 138, 474 N.E.2d 466, 474.) Instead, as our supreme court recently pronounced in *Nitz*, the trial court must conduct a preliminary investigation of the factual matters underlying a defendant's claim, and:

> "If the trial court *** determines [the defendant's claim] to be spurious or pertaining only to trial tactics, no new counsel should be appointed to represent the defendant. If, however, the defendant's allegations of incompetence indicate that trial counsel neglected the defendant's case, the court should appoint new counsel to argue defendant's claims of ineffective assistance of counsel [at the post-trial stage]." (*Nitz*, 143 Ill. 2d at 134, 572 N.E.2d at 919.)

(Accord *People v. Parsons* (1991), 222 Ill. App. 3d 823, 830-31, 584 N.E.2d 442, 447.) In *Parsons*, we recently held that "[i]t seems apparent from *Nitz* and is spelled out in *Jackson* (which the *Nitz* court cited approvingly) that there should be some interchange between the trial court and the defendant's trial counsel to explain the complained-of possible neglect." *Parsons*, 222 Ill. App. 3d at 830, 584 N.E.2d at 447-48.

An example of the proper "interchange" mandated by *Nitz* was illustrated in *Carroll*, where the trial judge asked the defendants to articulate the specific allegations of incompetence which they levelled in their ARDC complaints against their attorneys. (*Carroll*, 260 Ill. App. 3d 319.) The trial judge then determined after a brief discussion with the defendants that their complaints were based on trial strategy and were "spurious." (*Carroll*, 260 Ill. App. 3d at 336-37.) Consequently, it refused to conduct a more protracted hearing on the question of counsels' competence and allowed the attorneys to continue representing the defendants during the post-trial proceedings. *Carroll*, 260 Ill. App. 3d at 339-40.

In the case *sub judice*, defendant filed a complaint against his trial counsel after the jury's verdict. Prior to the hearing on defendant's post-trial motion for a new trial, defense counsel moved the trial

court to withdraw as defendant's attorney because of an alleged conflict of interest. The following discussion then took place:

"[THE COURT:] Is counsel prepared to argue the motion entitled Motion to Withdraw as Counsel?

[Defense Counsel:] I think under my obligation and responsibility for [defendant], I should complete my efforts on his behalf on the Motion for a New Trial as well as supplemental argument covering these points which were not specifically set out in the motion. Then perhaps I should address the Motion for Withdrawal.

[THE COURT:] I think that would be [sic] the cart before the horse. If there is going to be a Motion for New Trial, that would certainly reflect the presence of trial counsel. I think the motion to withdraw as counsel, since it has been filed at this time, should be addressed first.

[Defense Counsel:] The reason I say that is if [defendant] has to raise additional points, I should complete my job before review by other attorneys or offices reviewing my conduct and action.

[THE COURT:] I've had an opportunity to review the Motion to Withdraw as Counsel. [It] [s]eems to be predicated upon a simple situation that [defendant] has filed a complaint with the [ARDC], is that correct?

[Defendant:] Yeah.

[Defense Counsel:] Citing inappropriateness of my conduct on his behalf as well as allegations or innuendos of ineffectiveness.

[THE COURT:] Mere filings [sic] of a complaint to the [ARDC] in and of itself is not sufficient to predicate the withdrawal of the Public Defender's Office as counsel in this matter, based on the motion as filed. If there are no other arguments, the Court is prepared to rule.

* * *

[Defense Counsel:] Your Honor, if he wishes to raise [the allegations in defendant's ARDC complaint], Judge, the most appropriate place is post-trial proceedings, rather than raise those issues and perhaps be barred by waiving any appellate jurisdiction. I would suggest to the Court that any review by anybody concerning my conduct on behalf of [defendant] be done at the trial level.

[THE COURT:] The Court disagrees. They can look at all the transcripts, all the records, and see how the attorney did

during the course of the trial and we'll predicate a motion for new trial based on that. I don't think that is necessary at this point. I don't think that is the appropriate way to handle things. First of all, there has to be a preliminary showing before the [ARDC]. The mere feeling [*sic*] of that does not stop the proceedings here. The Public Defender's Motion to Withdraw denied.

[Defense Counsel:] My personal motion to withdraw, Judge?

[THE COURT:] Denied."

After this discussion, defendant's trial counsel proceeded to argue on behalf of defendant a motion for a new trial and for mitigation in sentencing.

The trial court in this case properly determined that it was required to rule on defense counsel's motion to withdraw before allowing him to argue the motion for a new trial on defendant's behalf. It also correctly ruled that it was not required to conduct a protracted hearing to evaluate counsel's performance during the trial. The trial court erred, however, in failing to make a preliminary inquiry, as required by *Nitz*, into the nature of defendant's allegations in his ARDC complaint against his attorney in order to determine if a conflict of interest did in fact exist. Instead, the court simply ruled that the mere filing of an ARDC complaint did not automatically create a conflict of interest and that new counsel did not have to be appointed to argue defendant's post-trial motion for a new trial. While the court was correct in ruling that defendant's filing of an ARDC complaint did not create a *per se* conflict of interest, it *could have* created such a conflict depending on the nature of the allegations therein. If defendant's charges were spurious or based on trial strategy, then new counsel need not have been appointed; but if they contained a colorable claim of attorney neglect, then new counsel should have been appointed to argue the ineffective assistance claim at the post-trial stage, since trial counsel obviously could not have been expected to argue in favor of his own allegedly ineffective representation.

Here, the record reflects that the court determined only on the basis of defendant's counsel's representations that defendant's ARDC complaint alleged "inappropriateness of [counsel's] conduct" and "allegations or innuendos of ineffectiveness." Although these charges may have been spurious or based solely on trial tactics, it is not entirely impossible that they could have included a colorable claim of defense counsel's neglect which would have required the court to appoint new counsel to argue the ineffective assistance of counsel claim at the post-trial stage. But because the trial court did not conduct the

preliminary inquiry mandated by *Nitz*, it obviously had no way of making that determination. (See *Parsons*, 222 Ill. App. 3d at 831, 584 N.E.2d at 448 ("We reject the implication of the State at oral argument that the trial court was in a position to reject defendant's factual contentions [of attorney neglect] *** based upon conduct of counsel at the trial when such conduct does not resolve or contradict defendant's factual contentions").) Accordingly, we find that the trial court erred in failing to conduct the necessary preliminary examination as to the factual basis of defendant's allegations against his attorney before denying counsel's motion to withdraw.

Furthermore, we cannot say, unlike the supreme court in *Nitz*, that this error was harmless beyond a reasonable doubt. In *Nitz*, the defendant complained that his trial counsel was incompetent for failing to call several witnesses who would have established a viable defense. (*Nitz*, 143 Ill. 2d at 133, 572 N.E.2d at 918.) After hearing argument, the trial court ordered that an evidentiary hearing be held at which a few of the witnesses identified by the defendant would be examined. The trial court, however, permitted the defendant's trial counsel to examine on defendant's behalf those witnesses. (*Nitz*, 143 Ill. 2d at 133, 572 N.E.2d at 918.) After hearing the testimony, the trial court determined that the defendant's ineffective assistance claim was unfounded, thus denying his motion for a new trial. *Nitz*, 143 Ill. 2d at 133-34, 572 N.E.2d at 918.

Our supreme court held that the court erred in allowing the defendant's trial counsel to examine the above-mentioned witnesses, as there was a conflict of interest between him and the defendant, counsel having, in effect, argued in favor of his own ineffectiveness. (*Nitz*, 143 Ill. 2d at 134-35, 572 N.E.2d at 919.) Nevertheless, the court found that the error was harmless beyond a reasonable doubt since there was no question but that the testimony given by those witnesses did not further defendant's defense. (*Nitz*, 143 Ill. 2d at 135, 572 N.E.2d at 919.) Therefore, the court concluded, defendant was not prejudiced by the court's failure to appoint new counsel to examine those witnesses. *Nitz*, 143 Ill. 2d at 135, 572 N.E.2d at 919.

In the case at bar, unlike *Nitz*, where our supreme court had before it a detailed factual basis for the defendant's claim, we lack a predicate for determining whether the trial court's failure to appoint new counsel for defendant was harmless in the absence of a record that would disclose to us the nature of the charges in his complaint. If his ARDC complaint had presented a cognizable charge of attorney neglect, then the court's error in not appointing new counsel was not harmless, because that ineffective assistance claim was not, *and could*

*not have been expected to be,* raised by his trial counsel in his post-trial motion for a new trial.

In sum, we find that the trial court erred in not making a preliminary inquiry into the nature of defendant's ARDC complaint against his attorney, as required by *Nitz,* in order to determine if a conflict of interest existed between them which would have prevented defense counsel from adequately presenting defendant's post-trial motion for a new trial. Since we cannot determine whether that error was harmless because the record is devoid of information indicating the nature of defendant's allegations, we remand the cause to the trial court to reconsider counsel's motion to withdraw and to determine the nature of defendant's charges against his trial counsel. In so doing, we emphasize, as did the court in *Parsons,* that "we are not remanding for a full evidentiary hearing and appointment of counsel on the issue of trial counsel's incompetence. Rather, we remand only for the purpose of the interchange [between the trial court and the defendant] mandated by *Jackson* and *Nitz.*" (*Parsons,* 222 Ill. App. 3d at 831, 584 N.E.2d at 448.) If, on remand, the trial court finds defendant's allegations against his attorney to be spurious or based solely on trial tactics, we expect that counsel's motion for withdrawal will be denied. If after that interchange, however, the trial court finds that defendant presents a colorable claim of attorney neglect, then it should grant counsel's motion for withdrawal and appoint new counsel for the purpose of pleading defendant's ineffective assistance claim.

Affirmed in part; reversed in part and remanded for proceedings not inconsistent with the views expressed in this opinion.

HARTMAN and DiVITO, JJ., concur.