(No. 67911.—■)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RICHARD NITZ, Appellant.

*Opinion filed March 28, 1991.—Rehearing denied June 3, 1991.*

CALVO, BILANDIC and HEIPLE, JJ., took no part.

Charles M. Schiedel, Deputy Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen and Douglas K. Smith, Assistant Attorneys General, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

In the early morning hours of April 10, 1988, a group of young men and women camping in a rural area of southern Illinois known as Rocky Comfort discovered an abandoned car with a burned interior. While the campers were vandalizing the car, the trunk popped open and the headless body of a white male fell to the ground. The

campers immediately notified the police, who positively identified the body as Michael Miley, and the abandoned car as Miley's.

Subsequently, on May 6, 1988, defendant, Richard Nitz, was arrested for the murder of Miley pursuant to an information filed by the Williamson County State's Attorney. On May 9, 1988, Rita Nitz, defendant's wife, was also arrested for the murder of Miley based on a separate information. The Williamson County grand jury subsequently returned a 12-count indictment against defendant and Rita Nitz, which replaced the previously filed informations. Counts I, II, and III charged defendant with first degree murder (Ill. Rev. Stat. 1987, ch. 38, pars. 9—1(a)(1), (a)(2)); count IV charged defendant with unlawful use of weapons by a felon (Ill. Rev. Stat. 1987, ch. 38, par. 24—1.1); counts IX and X charged defendant with two counts of felony murder in that defendant caused the death of Michael Miley while committing forcible felonies, aggravated kidnapping and robbery (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(3)). On Rita Nitz's motion, defendant's and Rita Nitz's trials were severed.

At the close of evidence, defendant and the State filed a joint motion to dismiss count IV, the charge of unlawful use of weapons by a felon. Thereafter, following closing arguments of counsel, the jury found defendant guilty of the murder of Michael Miley. Defendant's motion for a new trial and motion in arrest of judgment were denied. Defendant waived his right to a jury for the sentencing phase of the proceedings.

During the first phase of the sentencing hearing, the trial court found defendant eligible for the death penalty because he was at least 18 years of age at the time of the murder, and because defendant committed first degree murder while committing the offenses of aggravated kidnapping and robbery. (Ill. Rev. Stat. 1987, ch. 38, par. 9—1.) At the second stage of the sentencing

hearing, the court found no mitigating factors sufficient to preclude imposition of the death penalty. Consequently, the trial court sentenced defendant to death. The sentence was stayed (107 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); Ill. Rev. Stat. 1987, ch. 38, par. 9—1(i); 107 Ill. 2d Rules 603, 605).

While his conviction was awaiting review by this court, defendant filed a post-sentencing motion (Ill. Rev. Stat. 1987, ch. 110, par. 2—1401 *et seq.*) in the circuit court, attacking his sentencing hearing. This court remanded the cause to the circuit court for disposition of the motion. Following an evidentiary hearing, the circuit court denied defendant's post-sentencing motion.

Defendant argues on appeal that: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) defendant was denied a fair trial and due process of law by the State's use of defendant's post-arrest silence in the State's case in chief, on cross-examination of defendant and during closing argument; (3) defendant was denied effective assistance of counsel; (4) defendant was denied his right to an impartial jury when the trial court refused to *voir dire* prospective jurors as to bias against defendants with prior convictions and bias in favor of homosexuals; (5) defendant was denied a fair trial by the State's use of evidence that defendant hated homosexuals, that the deceased had been harassed when there was no evidence defendant was involved in the harassment, and by the introduction of a bat, knife and shovel where no evidence connected these items to any offense; (6) the State failed to prove the existence of an aggravating factor where the evidence did not establish beyond a reasonable doubt that a murder occurred in the course of another felony; (7) the trial court committed plain error by improperly considering the jury's verdicts convicting defendant of the uncharged and nonexistent

offenses of " 'first degree murder while committing' robbery and aggravated kidnapping"; (8) the trial court erred in denying defendant's post-sentencing relief; (9) the trial court erred in failing to appoint new counsel to represent defendant on his post-trial allegations of ineffective assistance of counsel; (10) the Illinois death penalty statute violates due process for failing to require that the State prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude imposition of the death penalty; (11) the Illinois death penalty is unconstitutional because after a defendant is found eligible for the death penalty, it places the burden on the defendant to prove that death should not be imposed; and (12) the Illinois death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences.

The facts adduced at trial will be presented as each issue is dealt with serially. The first issue defendant raises on appeal is that the State did not prove him guilty beyond a reasonable doubt.

Initially, we note that "[a] criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt." (*People v. Jimerson* (1989), 127 Ill. 2d 12, 43; *People v. Collins* (1985), 106 Ill. 2d 237, 261.) It is not the function of this court to retry a defendant when considering a challenge to the sufficiency of the evidence. (*Jimerson*, 127 Ill. 2d at 43.) Rather, determinations of the credibility of witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact. (*Jimerson*, 127 Ill. 2d at 43.) On review:

"  'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any*

rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' *** '[O]nce a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.' (Emphasis in original.)" *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

Given the aforementioned principles, we believe that the State presented sufficient evidence to support the jury's verdicts. Prior to detailing the evidence connecting defendant to Miley's homicide, however, we will present background information regarding Miley and defendant which we believe assists in understanding this case.

Testimony at trial revealed that at the time of his death, Michael Miley, the victim, was 23 years old, and lived in Murphysboro, Illinois. The victim was a member of the homosexual community in and around Carbondale, Illinois. As such, the victim occasionally visited two places where homosexuals frequently gathered. The first such place was the Two Hearts Bar in Carbondale, and the second place was the Crab Orchard Lake area east of Carbondale. The Crab Orchard Lake area consisted of a dam known as the "spillway" and four adjacent parking lots. Testimony at trial revealed that defendant, on the other hand, severely disliked homosexuals, which often caused him to harass and verbally assault the homosexuals gathering at Crab Orchard Lake.

Much of the testimony at trial connecting defendant to the victim's homicide concerned the night of April 6, 1988, the last night the victim was seen alive. Two State witnesses, Robby Buttry and Edwin Pierson, stated that they saw the victim at Crab Orchard Lake between 9:30 p.m. and 10 p.m. Buttry stated that he and the victim talked for approximately 30 minutes, and then Buttry

went home. Precisely where the victim went and what he did after meeting Buttry and Pierson at the lake is unknown.

Betty Boyer, a friend of the Nitzes, testified that on April 6, she baby-sat for Rita Nitz's son. She stated that she arrived at defendant's trailer on Pear Lane in Carbondale at approximately 6 p.m. Defendant's trailer was roughly one mile from the Crab Orchard Lake area. According to Boyer, defendant and Rita left in Rita's Plymouth Barracuda at approximately 7 p.m., but returned shortly thereafter. When they returned at approximately 7:30 p.m., Boyer saw Rita retrieve a gun from their trailer which she then handed to defendant in the car. Boyer stated that sometime later, between approximately 9:30 p.m. and 10 p.m., defendant and Rita returned home. Seconds later, another vehicle pulled up in front of defendant's trailer. A young, white male exited the car and approached defendant, who was standing outside the trailer. As Boyer watched through a window in the trailer, defendant shouted obscenities at the stranger in the driveway. Specifically, defendant yelled, "You *** faggot *** get off my driveway or I am going to kill you." Defendant went over to his Dodge Charger, which was parked in the trailer's driveway, and retrieved a baseball bat. Defendant struck the stranger several times in the back of the head with the bat. The stranger collapsed to the ground, whereupon defendant and Rita picked him up and placed him in the trunk of the stranger's car. Boyer stated that defendant drove towards the "spillway" at Crab Orchard Lake in the Barracuda, while Rita followed him in the stranger's car.

Later that evening, between approximately 11 p.m. and 11:30 p.m., Boyer received a phone call from defendant. Defendant told Boyer that the Barracuda had broken down, and asked Boyer to ask Earline Young to come pick up defendant and Rita. Boyer lived with

Young in a trailer approximately two blocks from defendant's trailer. Young picked up defendant and Rita, and returned a half hour later. After being dropped off at their trailer, defendant and Rita departed in defendant's Charger and did not return until 5 a.m. According to Boyer, when defendant returned at 5 a.m., he took a bucket of water and a brush and washed up a bloodstain on the driveway. Boyer went home at 6:30 a.m., April 7. Young's testimony is consistent with Boyer's statements regarding the events of April 6.

Seventeen-year-old Danny Walker, who lived approximately one mile from defendant's residence, testified on behalf of the State. Walker stated that on a Saturday night in early April, he attended a party at defendant's trailer. He arrived at approximately 11:30 p.m. According to Walker, defendant told him that he had killed a "faggot" by shooting him in the head at a place called Grassy Bottoms in Williamson County. Walker testified that defendant told him he had cut off the head of this person, placed the body in the trunk of a "big Chevy" that the dead man had been driving, and hid the head and the gun to conceal ballistics evidence. Walker stated that defendant told him that he and Rita then drove to Rocky Comfort, he in the green Barracuda, and Rita in the dead man's car. While at Rocky Comfort, defendant tried to burn the vehicle after taking a Sanyo stereo from it.

Walker stated that, initially, he did not believe defendant's story, whereupon defendant told Walker that he would show him the car and the body. According to Walker, between approximately 2 a.m. and 3 a.m., he drove defendant along Spillway Road to Grassy Bottoms, which defendant identified as the site of the actual shooting. Next, they drove toward Rocky Comfort, but they stopped their approach when they saw police cars at the site. Walker stated that, upon seeing the police

cars, defendant stated, "They found him." Walker and defendant proceeded back to defendant's trailer, and arrived at approximately 4 a.m.

In addition to Walker, Michael Stearns, who has known defendant for five years, testified that defendant confessed to him that he had committed a murder. According to Stearns, in late April 1988, he was at the Hideaway Lounge in Carbondale when defendant walked in at approximately 10:30 a.m. The two sat at the bar and began conversing. Stearns stated that, during their conversation, defendant received a phone call. When defendant returned after the phone conversation, Stearns stated that defendant appeared disturbed. Stearns asked defendant what was wrong, and defendant replied that there were several police officers searching his trailer. Stearns then asked in jest, "What the hell did you do, kill somebody?" To which defendant replied, "Yes, as a matter of fact, yes." According to Stearns, defendant then described an incident when a "faggot punk" followed him home, got out of his car and gave defendant a "bunch of shit," so defendant shot him in the head. Stearns testified that defendant said that he cut off the person's head to get rid of the "ballistics," and stashed the body in the car. Stearns stated that defendant never told him where he put the person's head, the gun, or where the car was left.

Testimony at trial revealed that the victim carried JC Penney and Sears credit cards in his wallet. Although at the time his body was discovered, neither the victim's wallet nor the two credit cards were discovered, evidence adduced at trial revealed that the two credit cards had been used on April 7 and 8, at the JC Penney and Sears department stores at the Kentucky Oaks Mall in Paducah, Kentucky. Three employees from the Sears store and two employees from the JC Penney store testified for the State. These five employees stated that a

dark-haired man whose hands were wrapped in Ace bandages and a woman he called his wife purchased several items using the victim's credit cards. Four of these five employees identified defendant in court as the man who used the victim's credit cards. Further, out of four employees who were shown a six-photo lineup, three employees positively identified defendant's photo as the bandaged man who used the victim's credit cards.

Several police officers from the Illinois State Police and local police departments testified regarding a search of defendant's trailer in Carbondale and his trailer in Tilden conducted on April 28, 1988. Among the numerous items recovered in the search were: 10 cassette tapes which Mark Miley, the victim's brother, identified as tapes the victim carried in his car; a tape of the victim's high school choir concert from 1979 on which Mark Miley had written "MHS, Chorus Concert, 1979, Christmas, Side 1"; a copy of a tape prepared by a local disc jockey for Mark Miley, which Mark had copied for the victim; a gold-colored Timex watch which Mark Miley positively identified as the watch he had given to the victim three months prior to his disappearance (the gold watch had type O blood on it; the victim had type O blood); a Sanyo AM/FM cassette tape player of the same model which the victim had in his car at the time of his disappearance; a box for a .22-caliber, semiautomatic pistol, with the gun missing; a set of Ace bandages; a shovel; a knife; and a baseball bat.

In addition to these items, the police recovered numerous items from defendant's trailer in Carbondale which matched the items purchased with the victim's credit cards on April 7 and 8 from JC Penney and Sears. Although all of these items matched the description and computer numbers listed on the credit card receipts from the two stores, testimony showed that most of these items could have been purchased at other JC Penney and

Sears stores. However, an employee at the Sears store in Paducah testified that two Pioneer speaker boxes found at defendant's trailer in Tilden were, in fact, from the Paducah Sears store. The employee explained that the shipping labels on the two boxes indicated that they came from the Sears store in Paducah.

At the close of the State's case in chief, defendant moved for a directed verdict as to all counts charged against defendant. The trial court denied defendant's motion.

During his case in chief, defendant called, among others, David Knight, who testified that on Thursday, April 7, he and defendant went to the Hideaway Lounge at approximately 3:15 p.m., and that defendant stayed there until approximately 8:30 p.m. Knight also stated that while he was at a party at defendant's trailer on Pear Lane on April 9, defendant did not mention that he had committed a murder.

Robert Baumbeck testified for the defense that he lived approximately 100 yards from defendant's trailer on April 6. Baumbeck stated that he can remember nothing out of the ordinary occurring that night—no screaming, arguing, or gun shots.

Rita Nitz's son recalled an evening in early April when he was sick and Boyer baby-sat for him. Rita's son stated that he heard a "little bit of an argument" during the night which he thought was between defendant and Rita.

Defendant also called two individuals who claimed they saw the victim in Two Hearts Bar on the night of April 6. Specifically, Jerry Cook testified that he saw the victim at 11 p.m. at the bar. Michael Fowler stated that he saw the victim between 10:30 p.m. and 11 p.m. at the bar, and that he saw the victim leave between 12 a.m. and 12:30 a.m.

Defendant also testified on his own behalf. Defendant denied making statements to Walker or Stearns about a homicide. Further, regarding the night of April 6, defendant stated that he and Rita went driving around Carbondale in Rita's Barracuda and tried to resolve marital problems they were experiencing. Defendant stated that at approximately 10:30 p.m., the Barracuda broke down on a back road near Highway 148. Defendant testified that after Young picked them up and drove them home, he and Rita drove back to the Barracuda in defendant's Charger. While they were pushing the Barracuda home, a piece of the bumper fell off. Since the Charger was having transmission problems, defendant and Rita borrowed Young's car to go find the missing bumper from the Barracuda. Defendant stated that they returned home at 1 a.m. On cross-examination, defendant accused Walker of being the victim's murderer. Defendant offered no evidence to support this accusation.

As stated earlier, when considering a challenge to the sufficiency of the evidence, our responsibility is not to retry defendant. Rather, after viewing the evidence in the light most favorable to the prosecution, we must only ask if any rational jury could have found defendant guilty beyond a reasonable doubt. (*Collins*, 106 Ill. 2d at 261.) After reviewing the testimony of Boyer, Walker, Stearns, the department store employees and the police officers who conducted the search of defendant's trailers, we conclude that defendant was proved guilty beyond a reasonable doubt.

On appeal, defendant raises three arguments in support of his claim that the State failed to prove him guilty beyond a reasonable doubt. First, defendant contends that Pierson and Buttry presented accounts of the whereabouts of the victim on the night of April 6 which conflicted with the State's theory that Boyer saw

defendant with the victim between 9:30 p.m. and 10 p.m. Defendant argues that Pierson's and Buttry's testimony regarding the night of April 6 shows that the victim was at Crab Orchard Lake after 10 p.m., and not at defendant's trailer between 9:30 p.m. and 10 p.m. as Boyer maintained.

Second, defendant argues that Boyer is not a credible witness because (1) she stated on cross-examination that she saw defendant and another man arguing for 30 to 45 minutes in defendant's driveway, but could not identify or describe the clothing or hair of the other man; (2) she stated that the man in defendant's driveway faced defendant when arguing with him, but turned his back to defendant after defendant retrieved a baseball bat from a car; (3) she stated that defendant struck the man in the driveway 10 to 20 times in the head and saw defendant cleaning up blood hours later, while another State witness (Young) testified that she saw no blood in the driveway; (4) defendant's nearest neighbor, Robert Baumbeck, testified that he heard nothing out of the ordinary the evening of April 6; and (5) Rita Nitz's son heard what he considered a brief argument *between defendant and Rita* the night of April 6.

Third, defendant argues that evidence that the victim was intoxicated at the time of his death refutes the State's theory that Boyer saw the victim on the night of April 6. The victim's toxicology report showed that the victim had a blood-alcohol level of .049 at the time of his death. (Under the Illinois Vehicle Code, a person with a blood-alcohol concentration of .10 is presumed intoxicated (Ill. Rev. Stat. 1987, ch. 95½, par. 11—501).) Because there was no testimony that the victim consumed any alcohol before 10 p.m. on April 6, and because two defense witnesses recalled seeing the victim in Two Hearts Bar the night of April 6, defendant argues that

the presence of alcohol in the victim's blood raises additional doubts regarding defendant's conviction.

We believe that defendant's allegations of weakness in the State's case are meritless given that they focus, for the most part, on the testimony of Betty Boyer. As stated in *People v. Collins* (1985), 106 Ill. 2d 237, 261-62, the determination of credibility of witnesses and evidence is exclusively within the province of the jury, and the jury will resolve any conflicts. Furthermore, the weaknesses defendant alleges can be dismissed. Regarding defendant's first argument that the testimony of Buttry and Pierson conflicted with the testimony of Boyer, the witnesses stated that their time estimates were approximations only, as they could not remember the precise time they saw the victim on April 6.

Regarding defendant's second argument that Boyer is not a credible witness, this determination is solely in the hands of the jury. (*Collins,* 106 Ill. 2d at 261-62.) Since the jury was exposed to all the potential infirmities defendant alleges, we will not disturb its conclusion. Lastly, defendant's third argument, which involved the testimony that the victim was in Two Hearts Bar on April 6, is meritless. The State not only discredited the testimony of these two defense witnesses, but also called four witnesses, including the victim's brother, who testified that the victim *was not* in Two Hearts Bar the night of April 6. Since the State offered plausible explanations for all of the evidentiary inconsistencies and shortcomings, and because the jury was made aware of such infirmities, we hold that sufficient evidence was produced for a jury to hold defendant guilty beyond a reasonable doubt.

Defendant next argues that the State violated his right to due process of law and to a fair trial through the use of defendant's post-arrest silence. Defendant acknowledges that he failed to raise this objection at trial

or in a post-trial motion. However, defendant asks this court to review this under the plain error doctrine. Defendant also argues that his counsel's failure to object to this use of his post-arrest silence was ineffective assistance of counsel.

In *Doyle v. Ohio* (1976), 426 U.S. 610, 618, 49 L. Ed. 2d 91, 98, 96 S. Ct. 2240, 2245, the Supreme Court held "it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." The Court argued that post-arrest silence is "insolubly ambiguous," and that while "the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." (*Doyle*, 426 U.S. at 617, 618, 49 L. Ed. 2d at 97, 98, 96 S. Ct. at 2244, 2245.) This court has previously applied the reasoning set forth in *Doyle*. See *People v. Szabo* (1983), 94 Ill. 2d 327; *People v. Green* (1979), 74 Ill. 2d 444; *People v. Rehbein* (1978), 74 Ill. 2d 435.

When defendant was arrested on May 6, 1988, he made several statements to the police regarding the victim's homicide. Specifically, defendant stated: that the police had arrested the wrong person; that he would beat the charges and be out of jail in a few days; that he knew who the "real killer" was, but he was not going to tell the police; and that unless the police dropped all the charges against him, he would not reveal the identity of the murderer and he would speak only through his attorney. At the time these statements were made, the police encouraged defendant to speak through his attorney. Defendant never identified the "real killer."

At trial, one of defendant's theories in the case was that someone other than defendant murdered the victim. That the State knew this is evidenced by their pretrial motion *in limine* to prevent defendant from accusing

others of the victim's murder during the trial. The State's motion *in limine* was denied. Subsequently, in its case in chief, the State elicited testimony from two arresting officers that, although defendant claimed when he was arrested that he knew the identity of the "real killer," defendant never told the police who the "real killer" was. The two officers commented six separate times that defendant never revealed the identity of the "real killer." Defendant argues that this testimony regarding what defendant did not say at the time of his arrest violated the principle set forth in *Doyle*.

Defendant argues that the State violated *Doyle* again during its cross-examination of defendant. Specifically, defendant refers to the following colloquy:

"Q. [Prosecutor]: On the day that you were arrested, did you tell those officers that you knew who the real killer was?

A. [Defendant]: I told them, yes, I did.

Q. *Okay, thank you. On that day you would not tell them who the real killer was, would you?*

A. Mr. Burns—

Q. *Did you tell them on that day who the real killer was, Mr. Nitz?*

A. No." (Emphasis added.)

On redirect, defense counsel asked defendant why he had not told the police who the "real killer" was at the time he was arrested. Defendant replied that Detective Burns had told him to go through his attorney. On recross, the prosecutor asked defendant to identify the "real killer." Defendant responded, "Danny Walker." Neither the prosecutor nor defense counsel asked any further questions regarding defendant's assertion that Walker was the murderer.

Finally, during rebuttal, the prosecutor made the following statements with regard to defendant's claim that Walker was the murderer:

"For him to sit there and try to tell you that it makes good common sense for a man who is arrested on May 6th to tell the police, 'I know who the real killer is, but I am not going to tell you.' Is that reasonable? If a person is truly innocent and they are being framed and railroaded, and they know the person who is framing and railroading them, *they obviously are going to tell somebody, including the police right there, who the real killer is. He wouldn't even tell the police. What did he tell them? He said, 'Oh, I am going to wait and go through my attorney and have it come out in court.'* He is really going to embarrass everybody. Then, what happens? He waits, what, four and one-half months and doesn't say anything about who the real killer is. Poor old Danny Walker, the real killer. You don't think that if he would have given any one of those press people a call or written them a letter saying, 'I know who the real killer is. Come on up here.' You don't think they would have been up there in about five minutes, and he could have told anybody who the real killer was? No. He sits up there four and a half months." (Emphasis added.)

The prosecutor then explained why the evidence does not support defendant's assertion that Walker is the murderer.

Defendant argues that the State's repeated use of his post-arrest silence during its case in chief, on cross-examination of defendant, and during rebuttal violated the principle that a defendant's post-arrest silence will not be used to discredit an exculpatory story offered at trial. (See *Doyle*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240.) We agree. The prosecutor improperly used defendant's post-arrest silence by pointing out that defendant never told the police at the time he was arrested that Walker was the "real killer." The State certainly was entitled to bring out any statements defendant made at the time of his arrest, which the State effectively did when questioning the arresting officers and defendant. But, by questioning the police and defendant on whether defend-

ant, in fact, told the police who the "real killer" was, the State struck at the heart of defendant's right to remain silent after being read his *Miranda* warnings. See *People v. Szabo* (1983), 94 Ill. 2d 327, 359-60 ("nothing that the defendant said at the time of arrest permits cross-examination on his failure to tell an exculpatory story, or justifies comments by the State's Attorney during closing argument").

However, as previously stated, defendant failed to object at trial and in a post-trial motion. Thus, the issue is waived. (See *People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Defendant asks this court to recognize it as plain error (107 Ill. 2d R. 615(a)). The plain error doctrine may be invoked in criminal cases to review an error which has not been properly preserved for review (1) where the evidence is closely balanced, or (2) where the error is of such magnitude that the defendant was denied a fair trial. (*People v. Carlson* (1980), 79 Ill. 2d 564, 576-77.) The plain error rule guards against the "possibility that an innocent person may have been convicted due to some error which is obvious from the record, but not properly preserved." (*Carlson*, 79 Ill. 2d at 576.) In the case at bar, the evidence is not closely balanced. Further, "[t]his court has held that a comment upon a defendant's post-arrest silence, while improper, is not an error of such magnitude as to clearly deprive the defendant of a fair trial." (*People v. Herrett* (1990), 137 Ill. 2d 195, 215; see also *People v. Stewart* (1984), 104 Ill. 2d 463, 488; *People v. Lucas* (1981), 88 Ill. 2d 245, 252.) Therefore, the plain error doctrine does not apply.

Defendant next argues that his counsel's failure to object to the State's improper use of his post-arrest silence constitutes ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must show his counsel's representation "fell below an objective standard of reasonableness" (*Strick-*

*land v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052) and that counsel's shortcomings were so serious as to " 'deprive the defendant of a fair trial, a trial whose result is reliable.' " (*People v. Albanese* (1984), 104 Ill. 2d 504, 525, quoting *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) As noted in *Albanese*, the Supreme Court offered the following guidelines to assist lower courts in applying this two-part test:

" '[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. *** If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' " *Albanese*, 104 Ill. 2d at 527, quoting *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069-70.

Although the prosecutor improperly commented on defendant's post-arrest silence, we do not find that defendant was denied effective assistance of counsel by his counsel's failure to object. As stated above, defendant must show prejudice by his counsel's failure to object. To show actual prejudice, defendant must establish that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " (*People v. Kokoraleis* (1989), 132 Ill. 2d 235, 277, quoting *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) We do not believe that defense counsel's failure to object affected the outcome of the trial. As we have previously stated, the evidence in this case was not closely balanced. Further, the State thoroughly discredited the notion that Walker was connected to the victim's homicide. Therefore, we con-

clude that defendant was not sufficiently prejudiced to support a claim of ineffective assistance of counsel.

In addition to counsel's failure to object to the State's improper use of defendant's post-arrest silence, defendant alleges numerous other errors which indicate he was denied his sixth amendment right to effective assistance of counsel.

Defendant argues that counsel failed to make the *proper objection* to the prosecutor's remark in closing that Rita Nitz failed to give an alibi for defendant. During defendant's case in chief, Rita testified that her son had blood type O, the same as that found on the gold watch recovered during the search of defendant's trailer on April 28. On cross-examination, the court prevented the prosecutor from questioning Rita regarding the night of April 6, holding that it was beyond the scope of direct examination. Subsequently, during closing argument, the prosecutor made the following statement:

> "Rita Nitz took the stand, ladies and gentleman, and what did she say in defense of Richard Nitz? Her son had type 'O' blood. *She did not say one other word about where [defendant] was on April the 6th or what he was doing.*" (Emphasis added.)

Defense counsel immediately objected to this statement, arguing that "[Rita Nitz] is a defendant in this case and she has a right to remain silent as to any material allegations and as to any date." The trial judge sustained the objection and instructed the jury to "disregard what the witness did not testify to."

In his brief, defendant argues that this objection was unnecessary, strategically unreasonable, and prejudicial to defendant. Defendant claims that his counsel should have objected on other grounds, although he does not suggest an alternative. Further, although the court admonished the jury to ignore what Rita did not say, defendant argues that the damage was already done.

The State, on the other hand, argues that not only was counsel's objection not prejudicial, but that it actually benefitted defendant. The State claims that because counsel mentioned Rita's fifth amendment right to remain silent, the jury understood why defendant never called Rita as a witness to corroborate her husband's alibi.

We agree with the State that defendant's argument is meritless on this point. Given that defense counsel offered a valid objection to the prosecutor's improper comment, and the court correctly admonished the jury to ignore what Rita did not testify to, we do not find that defense counsel was ineffective merely because another attorney may have objected on other grounds. See *People v. Flores* (1989), 128 Ill. 2d 66, 106 ("defense strategy will generally not support a claim of ineffective representation").

Defendant next contends that his trial counsel was ineffective because he failed to impeach three State witnesses through the use of prior inconsistent statements, and failed to use those statements as substantive evidence under section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1).

We will first consider defendant's contention that his lawyer failed to properly impeach Boyer. At trial, Boyer stated that on the evening of April 6, a white male, approximately 22 to 23 years old, was beaten by defendant in defendant's driveway. Boyer was unable, however, to provide a more detailed description of the stranger in the driveway. On cross-examination, defense counsel elicited testimony that Boyer had given a statement to police on May 6 in which she described in detail the person in the driveway. The following is an excerpt of Boyer's cross-examination:

"Q. [Defense counsel]: I think you also gave a statement on May the 6th?

A. [Boyer]: Yes.

Q. In that statement did you give a description of this person that was supposedly there?

A. I did, but I was not real sure because I was under a lot of pressure from the police officers that night.

Q. You stated that you were under a lot of pressure from the police officers that night?

A. Yes. They was [sic] questioning me, plus they had came [sic] in and told me that Richard Nitz was on the phone making a statement against me saying that I was the one with him that stole all of the stuff that he stole."

In Boyer's May 6 statement to the police, she stated that the person in the driveway was approximately 5 feet 6 inches and 130 to 140 pounds, had "curly, or wavy light brown hair" (collar length), and was wearing a blue jean jacket, blue jeans, and a baseball cap. Defendant contends that counsel's failure to fully impeach Boyer as to this prior description of the stranger in the driveway and also offer this prior description as substantive evidence under section 115—10.1(c)(2)(C) was ineffective assistance of counsel. See *People v. Wilson* (1986), 149 Ill. App. 3d 1075.

We disagree. As stated in *Strickland*, to prove ineffective assistance of counsel, "defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065, quoting *Michel v. Louisiana* (1955), 350 U.S. 91, 101, 100 L. Ed. 83, 93, 76 S. Ct. 158, 164.) We believe that counsel's decision not to bring out the specifics of Boyer's prior description of the stranger in the driveway was sound trial strategy. As the State points out in its brief, there is a reasonable probability that had counsel brought out the specifics of Boyer's prior description, the jury might have focused on the similarities be-

tween the victim and the prior description rather than the dissimilarities. Testimony at trial revealed that the victim was 23 years old, approximately 5 feet 7 inches tall, weighed roughly 135 pounds, and had short, wavy, brown hair. Further, the victim was wearing a tan jacket and blue jeans on the night he disappeared. These characteristics of the victim are similar to Boyer's prior description. Since how to best impeach a witness with a prior statement is a strategic choice (see *Jimerson*, 127 Ill. 2d at 33-34), we do not find error with counsel's decision to pursue the concept of "police pressure" in cross-examining Boyer about her prior description. In addition, given the similarities between Boyer's prior description and the victim's actual appearance on the night of April 6, we certainly do not find it error that counsel did not admit the details of the prior description as substantive evidence.

Defendant also contends that defense counsel ineffectively impeached Walker. Specifically, defendant cites three instances where Walker's testimony was inconsistent with prior statements given to the police. Defendant's first and principal claim of ineffective assistance of counsel is that counsel failed to effectively impeach Walker regarding his whereabouts on April 6 and 7. In a prior statement to the police, Walker consistently maintained that defendant confessed to him about the murder *before* Walker went to his girlfriend's house in Harrisburg. During his cross-examination, Walker admitted that in his prior statement he had told the police that he went to Harrisburg on April 6. Defendant argues that, according to Walker's version of events, at the time that Walker went to Harrisburg, the homicide which was the subject of defendant's alleged confession had not yet occurred. Walker's cross-examination regarding this point is as follows:

"Q. [Defense counsel]: Do you remember making a statement to the police on April 29, 1988?

A. [Walker]: I don't remember the date.

Q. Do you remember being asked where you were on the 6th and 7th of April?

A. I don't know if they asked me about the 6th or 7th, but I think it was the 8th.

Q. *Do you remember stating to them that you were at your girlfriend's parent's?*

A. *Yes.*" (Emphasis added.)

Defendant claims that if counsel had impeached Walker on this matter, the jury would have doubted Walker's testimony, and ultimately defendant's guilt. Further, defendant argues that counsel should have offered as substantive evidence (Ill. Rev. Stat. 1987, ch. 38, par. 115—10.1) Walker's statements that he knew of the victim's homicide when he went to Harrisburg on April 6.

Defendant's argument is meritless. Defendant correctly states that Walker has consistently maintained that defendant told him about the homicide before Walker went to Harrisburg. However, *Walker also has consistently stated that defendant confessed to him on a Saturday night/Sunday morning, and that the next day, he went to Harrisburg.* As the State correctly observes, when Walker gave his prior statement to the police, he incorrectly believed April 6 and 7 were a Sunday and Monday. In fact, April 6 and 7 were a Wednesday and a Thursday. Defendant's prior statement to the police and his testimony at trial bears this out. On redirect examination, in response to his statement on cross-examination admitting that he had previously told the police he was in Harrisburg on April 6 and 7, Walker stated, "I had the dates all confused, and they were asking dates and stuff and I was going by days and got everything all messed up." Thus, defense counsel could not have impeached Walker regarding this matter.

Further, we find that defense counsel's cross-examination of Walker was reasonable in terms of defendant's

trial strategy. As previously noted, defendant's primary theory was that someone other than defendant committed the victim's homicide. On cross-examination of Walker, counsel brought out that Walker had made inconsistent statements regarding his whereabouts the night the victim disappeared. This cross-examination left open the possibility that Walker might have been involved in the victim's homicide. Although Walker was able to diminish the harm of this prior inconsistent statement by explaining that he only remembered days, not dates, counsel conducted a reasonable and competent cross-examination of Walker.

Defendant also raises other instances where his counsel failed to effectively impeach Walker. First, Walker testified at trial that the conversation between defendant and him in which defendant confessed to committing a murder lasted 15 minutes. Further, Walker testified that Rita was not present when defendant told him about the homicide. In a prior statement to the police, Walker stated that defendant and he conversed for approximately 1½ hours, and that Rita was present for part of the conversation. Second, at trial, Walker testified that after defendant drove him to the crime scene that evening, Walker dropped defendant off at his trailer and *did not go inside the trailer*. In Walker's prior statement, he stated that defendant went inside the trailer and told Rita that the police had found the body. Defendant argues that this statement implies that Walker also went inside the trailer.

Even assuming counsel was ineffective in failing to impeach Walker as to these statements, we do not believe that defendant was sufficiently prejudiced to warrant a finding of ineffective assistance of counsel. Under *Strickland*, to demonstrate ineffective assistance of counsel, a defendant must show that there is a " 'reasonable probability that, absent the errors, the factfinder

would have had a reasonable doubt respecting guilt.' " (*People v. Caballero* (1989), 126 Ill. 2d 248, 260, quoting *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.) We do not believe these inconsistencies in Walker's testimony created a reasonable doubt regarding defendant's guilt. Further, counsel may have had a sound trial strategy in only impeaching defendant with respect to his whereabouts on April 6 and 7, rather than these two minor inconsistencies.

Defendant also claims that counsel failed to confront Stearns regarding prior inconsistent statements he made concerning the time defendant arrived at the Hideaway Lounge on April 28, and whether defendant made a phone call *or* received a phone call at the bar. In a prior statement to the police, Stearns stated that defendant arrived at approximately 1:30 p.m., and that he *called* his wife from the bar. At trial, Stearns testified that defendant arrived at the Hideaway Lounge at approximately 11 a.m., and that defendant *received* a phone call at the bar.

As the State correctly points out, the record indicates that defense counsel thoroughly cross-examined Stearns. The mere fact that another attorney might have questioned Stearns regarding these minor inconsistencies is not enough to prove ineffective assistance of counsel. Therefore, we cannot say that defense counsel's representation fell below an objective standard of reasonableness. (See *People v. Albanese*, 104 Ill. 2d at 524.) These two inconsistencies are minor, and certainly do not raise a reasonable doubt regarding the veracity of Stearn's other statements which connect defendant to the victim's homicide. Further, we do not believe defendant was sufficiently prejudiced by counsel's failure to raise these matters. *People v. Steidl* (1991), 142 Ill. 2d 204, 249-50.

Defendant's third claim of ineffective assistance of counsel focuses on counsel's failure to object to two comments by the prosecutor during closing argument and rebuttal.

Specifically, defendant objects to counsel's failure to object to this comment during the State's closing argument involving the testimony of Boyer:

"[Boyer] said that on that night [April 6] she remembers Richard and Rita Nitz coming home in the Plymouth Barracuda around ten or ten thirty or *possibly even as late as eleven o'clock*." (Emphasis added.)

Defendant argues that this comment is a misstatement because Boyer never testified that defendant arrived home later than 10 p.m. Defendant argues that counsel's failure to object to this statement was severely prejudicial to defendant because the times involved were crucial to the State's theory of guilt.

As stated in *People v. Whitlow* (1982), 89 Ill. 2d 322, 341, "[a] 'fact not based upon evidence in the case may not be properly argued to the jury ***' " (quoting *People v. Beier* (1963), 29 Ill. 2d 511, 517). In the case at bar, Boyer testified that defendant and Rita returned home between 9:30 p.m. and 10 p.m. On cross-examination, Boyer admitted that she had previously estimated the time to be about 10:30 p.m. Although the State acknowledges that Boyer never testified that defendant and Rita arrived at 11 p.m., the State argues that the statement was not so far off the evidence to be objectionable. Further, the State claims that the timing of events on the night of April 6 was not "crucial" to its case, and thus defendant was not prejudiced by the absence of objection.

We find that this comment by the prosecutor was improper for it misstated the evidence adduced at trial. However, we agree with the State that defendant was not sufficiently prejudiced by the absence of an objec-

tion. As stated earlier, defendant must prove that, absent the error, the jury would have had a " 'reasonable doubt respecting guilt.' " (See *Caballero*, 126 Ill. 2d at 260, quoting *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068-69.) That clearly is not the case here. All of the State's witnesses stated that they were estimating times to the best of their ability. Further, defense counsel effectively brought out at trial the discrepancies between the time Buttry and Pierson saw the victim at Crab Orchard Lake and the time Boyer allegedly saw him being beaten in defendant's driveway. Since the jury was aware of these discrepancies, and was advised by the judge to disregard any argument or statement by the attorneys not based on the evidence, we find that defendant was not sufficiently prejudiced by the improper comment.

Defendant also claims that defense counsel was incompetent for failing to object to the following statement by the prosecutor on rebuttal:

> "We could have kept you here probably for another week or two *** and you would have been up to your knees in water in that jury box. How much more do we have to bring in to convince you."

Defendant cites *People v. Emerson* (1983), 97 Ill. 2d 487, in support of his argument. In *Emerson*, this court stated that "[i]t is error to comment on facts that are inadmissible [citation], or to suggest that evidence of guilt existed which, because of defendant's objection, cannot be brought before the jury. [Citations.]" *Emerson*, 97 Ill. 2d at 497.

We agree with the State that this comment by the prosecutor was not objectionable given its context. As a general rule, "a defendant cannot ordinarily claim error where the prosecutor's remarks are in reply to and may be said to have been invited by defense counsel's argument." (*People v. Dixon* (1982), 91 Ill. 2d 346, 350-51,

citing *People v. Vriner* (1978), 74 Ill. 2d 329, 344.) In this instance, defense counsel invited the complained-of statement. Several times during closing argument, defense counsel argued that the State had failed to investigate the case thoroughly, failed to interview certain witnesses, and failed to run certain tests on possible evidence for fear that it might exonerate defendant. Prior to making this comment on rebuttal, the prosecutor reviewed the specific evidence that defense counsel argued would have exonerated defendant if the State had conducted a thorough examination. The prosecutor explained to the jury that the evidence defense counsel referred to was not probative or relevant. The prosecutor then made the complained-of statement.

In making this comment on rebuttal, the prosecutor was not arguing that there was more evidence probative of defendant's guilt which the jury did not hear, but rather there was much evidence which the State did not offer because it was not probative. Since the objected-to statement was invited by defense counsel's closing argument, this comment was not error. (See *People v. Ruiz* (1989), 132 Ill. 2d 1, 17 ("The prosecutor's comment was invited by defense counsel's own argument and thus was not error, much less plain error").) Further, because defense counsel presented a strategically reasonable argument during closing argument, he was not ineffective for inviting the comment or for failing to object.

Defendant's fourth claim of ineffective assistance of counsel again focuses on instances in the trial where defense counsel failed to object. First, defendant argues that counsel should have objected when the prosecutor elicited testimony from Boyer and Stearns that these two witnesses did not contact the police because they feared defendant. Neither witness came forward with evidence of the crime until after defendant had been arrested. Defendant argues that since there had been no

attack on Boyer's or Stearns' credibility at the time these statements were elicited, these statements improperly bolstered the witnesses' credibility.

However, under Supreme Court Rule 238(a), a party may introduce impeachment evidence regarding its own witnesses to lessen the prejudicial effect. (134 Ill. 2d R. 238(a); see *People v. Garcia* (1983), 97 Ill. 2d 58, 79; *People v. Soskins* (1984), 128 Ill. App. 3d 564, 573.) This impeachment evidence was properly admitted under Rule 238(a). Therefore, defense counsel was not incompetent for not objecting.

Defendant also argues that counsel should have objected when the prosecutor stated in closing argument that "Betty Boyer is telling the truth." Defendant argues that the prosecutor may not "interject his personal belief in the veracity of [a witness'] testimony." (*People v. Townsend* (1985), 136 Ill. App. 3d 385, 394.) While this proposition is true, that is not what occurred in this instance. The prosecutor did not state that "Betty Boyer is telling the truth," but rather stated:

> "I want you to understand that [Betty Boyer] took that stand and she told you the truth, and you can believe her, not only because you could tell that she was telling the truth but because we have been able to corroborate all or almost all of everything that she said from the witness stand."

As the State points out, it is a fair comment on the evidence to argue that a witness is believable because of her demeanor while testifying and because her testimony was corroborated. (See *People v. Emerson* (1987), 122 Ill. 2d 411, 434-35.) Since that is what the prosecutor did in this instance, we fail to see defense counsel's error in not objecting to the comment.

Defendant's last argument regarding his claim of ineffective assistance of counsel is that defense counsel failed to file a motion for change of venue. Defendant

points to the *voir dire* of potential jurors as evidence defendant could not obtain an impartial jury. Specifically, out of 100 potential jurors questioned, only 6 had not read or heard about the case. Further, 24 jurors were excused after stating that they could not be impartial due to their exposure to publicity. Defendant contends that it was not a reasonable strategy to proceed to trial in a venue which was obviously saturated with unfavorable publicity.

We agree with the State that defense counsel did not err in failing to seek a change of venue. As stated in *People v. Taylor* (1984), 101 Ill. 2d 377, 386:

> "It is not necessary that jurors be unaware of the case before they assume their role in the jury box. Crimes, especially heinous crimes, are of great public interest and are extensively reported. \*\*\* Total ignorance of the case is exceptional, and it is not required. [Citation.] *What is required is the assurance that a juror will be able to set aside all information he has acquired outside the courtroom, along with any opinions he has formed, and decide the case strictly on the evidence as presented in the courtroom.*" (Emphasis added.)

See *Irvin v. Dowd* (1961), 366 U.S. 717, 722-23, 6 L. Ed. 2d 751, 756, 81 S. Ct. 1639, 1642-43.

In the case at bar, each juror stated that he would be able to put aside anything he had heard or read about the case, and base his decision solely on the evidence. Since defendant does not argue that the jury was, in fact, biased or influenced by pretrial publicity, we fail to see the prejudice to defendant. (See *People v. Lego* (1987), 116 Ill. 2d 323, 334; *People v. Speck* (1968), 41 Ill. 2d 177.) Thus, we do not find ineffective assistance of counsel because defendant's attorney failed to file a motion for change of venue.

Defendant next argues that he was denied his right to trial by an impartial jury. Prior to *voir dire*, defense

counsel submitted eight questions to the court to be asked of potential jurors. The court subsequently agreed to ask two out of the eight questions, explaining that the subject matter of the six other questions would be adequately covered during *voir dire*. In addition, the court stated that if either party felt a certain subject area needed further exploration, he need only approach the bench and advise the court. Defendant now argues that the court committed error in not asking the six questions the court omitted. These questions dealt with juror bias against defendants with prior convictions and juror bias in favor of homosexuals. As the State correctly points out, defendant failed to raise this issue in any of the post-trial motions he filed. Therefore, the issue is waived. See *Enoch*, 122 Ill. 2d at 186.

In his fifth issue on appeal, defendant argues that he was denied a fair trial by the State's use of irrelevant and prejudicial evidence that the defendant "hated" homosexuals and that the victim had been harassed at the Crab Orchard Lake area two months prior to his homicide. Defendant also alleges error by the introduction into evidence of a baseball bat, knife and shovel, none of which was linked to any criminal offense.

At trial, numerous State witnesses testified that defendant "hated" homosexuals. Further, defendant's brother-in-law testified that defendant organized a motorcycle club (the "Trog Club") which frequented the Crab Orchard Lake area. According to this witness, defendant considered the Crab Orchard Lake area Trog territory, and he did not like homosexuals congregating there. Defendant argues that this evidence is irrelevant and prejudicial, and should not have been admitted. In support of his argument, defendant cites *People v. Lampkin* (1983), 98 Ill. 2d 418. Defendant also contends that this court should consider this argument under the

plain error doctrine, recognizing that he failed to raise these arguments in any of his post-trial motions.

Initially, we note that the plain error doctrine does not apply because the court did not err in admitting this evidence. Further, defendant's reliance on *Lampkin* is misplaced. In *Lampkin*, this court ruled that the statement "you white *** coppers *** we will get you later" was inadmissible to show *malice and criminal intent*. This court believed that the statement was irrelevant, had very little probative value, and was likely to arouse prejudice or hostility on the part of the jury. (*Lampkin*, 98 Ill. 2d at 428.) The evidence defendant now objects to as irrelevant and prejudicial was not offered to show malice or criminal intent, but rather to substantiate the State's claim of *motive*. In addition, in *Lampkin*, this court emphasized that the objectionable comment was made six years prior to the crime in question and under circumstances entirely unrelated to the crime in question. In this case, defendant's statements and actions indicating that he "hated" homosexuals continued up to and after the victim's homicide. Thus, they were relevant and probative.

Throughout the trial, the State attempted to establish that defendant killed the victim because the victim was a homosexual. The evidence regarding defendant's dislike for homosexuals and the formation of the Trog Club supports the State's theory of motive in this case. As stated in *People v. Smith* (1990), 141 Ill. 2d 40, 56, "[i]t is also well established *** that any evidence which tends to show that an accused had a motive for killing the deceased is relevant because it renders more probable that the accused did kill the deceased." Further, "while any evidence which tends to show that an accused had a motive for killing the deceased is relevant, such evidence, to be competent, must at least to a slight degree tend to establish the existence of the motive relied on." (*People*

*v. Stewart* (1984), 105 Ill. 2d 22, 56; see also *People v. Branion* (1970), 47 Ill. 2d 70, 77; *People v. Gougas* (1951), 410 Ill. 235, 238-39.) We believe that testimony that defendant "hated" homosexuals and, in fact, formed a motorcycle club which patrolled the area in which homosexuals congregated supports the State's theory that defendant had a motive for killing the victim.

Defendant also contends that the court erred by failing to exclude evidence that the victim reacted angrily to being harassed while at the Crab Orchard Lake area in late January 1988. At trial, Pierson stated that he and the victim were at the lake area in late January when a searchlight from a pickup truck shone on them. The victim subsequently chased after this pickup in his car, and returned to the lake area enraged. At trial, defendant made an oral motion *in limine* to keep this evidence out. Defendant argued that this evidence is irrelevant and prejudicial because there was no testimony connecting defendant to this incident. We find, however, that because defendant failed to include this objection in any of his post-trial motions, the issue is waived. (See *Enoch*, 122 Ill. 2d 176.) Further, even if we were to find the admission of this evidence error, the plain error doctrine does not apply. As stated earlier, the evidence was not closely balanced, nor was the alleged error of such magnitude that defendant was denied a fair trial. *Enoch*, 122 Ill. 2d 176.

Defendant also argues that the court erred by admitting into evidence a baseball bat, knife and shovel which were seized during the search of defendant's trailer on April 28. Although these items were admitted into evidence by agreement, defendant now argues that these items were highly prejudicial to defendant because they were not linked to any criminal offense. The State argues that defendant waived this argument by failing to object at trial. (*Enoch*, 122 Ill. 2d 176.) We agree with

the State that defendant has waived this argument on appeal. Further, we note that even if we were to consider this error, we fail to see the prejudice caused by having this evidence admitted into evidence. Forensic tests were run on each item. No blood was detected on the bat or shovel. Traces of blood were found on the knife, but it could not be determined whether it was human blood. Defendant's counsel effectively argued during closing argument that the absence of blood on these items is probative of defendant's innocence. Also, the trial court emphasized at the hearing on defendant's post-trial motions that these items "tend to show lack of guilt on defendant's part."

Defendant next argues that the State failed to prove a statutory aggravating factor supporting his eligibility for the death penalty. Defendant claims that the State failed to prove that defendant committed murder in the course of another felony because the State did not prove beyond a reasonable doubt that the victim was alive when he was placed in the trunk of his car. Defendant states that if the victim was dead when placed in the trunk, defendant could not have committed murder in the course of committing robbery or aggravated kidnapping.

We disagree. With regard to the aggravating factor of robbery, it is clear that the State does not have to prove that the victim was alive at the time the robbery occurred, provided the murder and the robbery were part of the "same criminal episode." (See *People v. Thomas* (1990), 137 Ill. 2d 500, 534.) In *People v. Richardson* (1988), 123 Ill. 2d 322, we stated:

> "Just as the phrase 'in the course of' does not require that defendant complete one of the other felonies in order to be eligible for the death sentence [citation], we also believe that it does not require that the armed robbery commence prior to the fatal gunshot, since the pre-

cise timing of the offenses is not necessarily indicative of defendant's intent. The jury concluded beyond a reasonable doubt that defendant committed both a murder and an armed robbery, which offenses occurred essentially simultaneously. The trial testimony and the verdicts sufficiently support the court's finding that murder occurred 'in the course of' an armed robbery." *Richardson*, 123 Ill. 2d at 359.

See also *People v. Flores* (1989), 128 Ill. 2d 66, 97; *People v. Walker* (1982), 91 Ill. 2d 502.

In this case, there was sufficient evidence for the sentencing judge to conclude that defendant committed murder in the course of committing robbery. Several employees of JC Penney and Sears positively identified defendant as the man who used the victim's credit cards on April 7 and 8. Further, during the search of defendant's trailer on April 28, the police found the victim's gold watch and specially made cassette tapes. As stated above, it is not necessary for the State to prove that these items were removed from the victim's possession before the fatal shot was fired in order to prove the murder was committed in the course of a robbery. Thus, the State proved beyond a reasonable doubt that defendant committed murder in the course of committing robbery. See also *Thomas*, 137 Ill. 2d at 535 ("we think \*\*\* that the crime of murder is not necessarily complete when the victim's heart stops beating, but rather the crime continues throughout the time that the perpetrator conceals the crime and flees the scene").

Given that the State proved beyond a reasonable doubt the statutory aggravating factor of robbery, defendant is eligible for the death penalty, and it is not necessary to determine whether defendant is also eligible under the aggravating factor of aggravated kidnapping.

Defendant's next argument is that the trial court committed plain error at the first stage of the sentenc-

ing hearing by considering the jury's verdicts convicting defendant of the uncharged and nonexistent offenses of "first degree murder while committing" the offenses of robbery and aggravated kidnapping. Also, defendant argues that the court committed error because the jury was asked to find an eligibility factor for the death penalty after defendant had waived his right to a jury for sentencing.

Defendant's arguments are totally without merit. Defendant's first argument seems to find fault with the wording of the verdict forms given to the jury relating to felony murder. Specifically, the verdict form read, "We, the jury, find defendant Richard C. Nitz guilty [not guilty] of the offense of First Degree Murder while committing the offense of Robbery." A similar form was provided for the felony murder charge of aggravated kidnapping. Defendant argues that there is no such offense as murder "while committing" another felony, and actually the issue of whether the murder was in the course of another felony is a question for the sentencing phase of the trial.

The offense of committing murder while committing another felony (such as robbery or aggravated kidnapping) is commonly known as felony murder. (See Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(3) ("A person who kills an individual without lawful justification commits first degree murder if, in performing the acts which cause the death: *** (3) He is attempting or committing a forcible felony other than second degree murder").) Thus, defendant's argument that he was charged with a "nonexistent" offense is meritless.

Furthermore, a simple reading of defendant's indictment reveals that he was not convicted of "uncharged" offenses. Defendant was charged with five counts of first degree murder, two of which involved felony murder. Defendant's felony murder charges read, "[Defend-

ant] committed the offense of first degree murder in that \*\*\* the defendant, without lawful justification, while committing a forcible felony, Aggravated Kidnapping [or Robbery], \*\*\* shot [the victim] with a gun and thereby caused the death of [the victim]." See Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)(3).

Just as defendant's argument that he was convicted of "uncharged and nonexistent" offenses is meritless, defendant's argument that the jury made the finding that an eligibility factor existed also is meritless. At the first phase of the sentencing hearing, the court took judicial notice of all the evidence and exhibits offered at trial. The court also admitted certified copies of the jury's verdicts. Clearly, the court had the right to admit into evidence the testimony, exhibits, and jury verdicts from the trial. (See Ill. Rev. Stat. 1987, ch. 38, par. 9—1(e); *People v. Owens* (1984), 102 Ill. 2d 88, 97.) The *sentencing judge*, however, determined that an eligibility factor existed pursuant to section 9—1(b)(6)(c). Support for this conclusion is found in the transcript from the sentencing hearing in which the judge stated:

"I further find that [defendant] intentionally committed the offense of first degree murder while committing the offense of aggravated kidnapping, and that he committed the offense of first degree murder while committing the offense of robbery, and that he qualifies for the imposition of the death penalty."

Although the jury concluded that defendant committed murder while committing robbery and aggravated kidnapping, the judge obviously determined that the eligibility factors existed.

Defendant's next arguments involve two issues that he raised in his motion for post-sentencing relief, and which the trial court denied after an evidentiary hearing. We conclude that the trial court was correct in its decisions.

Defendant first argues that he did not knowingly and intelligently waive his right to a jury for his sentencing hearing. Defendant maintains that both the court and his attorney failed to advise him of the non-unanimity rule in jury sentencing, *i.e.*, that the favorable vote of one juror would have been sufficient to preclude the imposition of the death penalty, and that his trial counsel actually gave him erroneous advice concerning whether to waive a jury for sentencing.

We disagree with defendant and find that defendant knowingly and intelligently waived his right to a jury for sentencing. We note that although "[t]he right to a sentencing jury in a capital case is a statutory, not a constitutional right" (*People v. Erickson* (1987), 117 Ill. 2d 271, 289), a defendant's waiver of this right has to be knowing and intelligent (*Albanese*, 104 Ill. 2d at 535). Whether a defendant's waiver is, in fact, knowing and intelligent will turn on the facts and circumstances of each case. (*Albanese*, 104 Ill. 2d at 535-36.) Further, and more importantly for the case at bar, "[w]e have *** declined to impose a requirement that a defendant be expressly advised of the nonunanimity rule *** as a condition of a valid jury waiver at a capital sentencing hearing." *People v. Ruiz* (1989), 132 Ill. 2d 1, 20-21.

Prior to signing the written waiver of jury form, the following colloquy between defendant and the trial judge took place:

"Q. [Court]: Mr. Nitz, how old are you, sir? I am going to ask you a series of questions to make sure that you are doing this voluntarily, voluntarily and knowingly. Do you understand that?

A. [Defendant]: Yes.

Q. Okay, how old are you?

A. Thirty-seven.

Q. How far did you go in school?

A. I got one associate degree in college, and I am supposed to start criminal justice.

Q. Okay, so you can read and write?

A. Yes.

Q. And you do understand what is occurring in this courtroom today?

A. Yes.

Q. Do you understand that you are charged in this case with capital murder?

A. Yes.

Q. And that a possible penalty for that offense is the death penalty?

A. Yes.

Q. And that [your attorney] has indicated to the court that you wish to waive your right to have a jury sentence you if you were found guilty of that offense?

A. Yes.

Q. Is that correct?

A. Yes.

Q. Now, has anyone threatened you or promised you anything to get you to give up your rights to have a jury sentence you?

A. No.

Q. Are you doing it voluntarily?

A. Yes.

Q. Are you doing it of your own free will?

A. Yes.

Q. Have you discussed this with your attorney?

A. Yes.

Q. Do you understand that once you do this waiver and I begin the jury selection process, once you do this waiver that it cannot be changed at a later date?

A. Yes."

Based on this exchange alone, we believe defendant knowingly and intelligently waived his right to a jury for sentencing. (See *Erickson*, 117 Ill. 2d at 295-96; *People v. Madej* (1985), 106 Ill. 2d 201, 220-21.) Defendant acknowledged that he had spoken with his attorney regarding this important decision, admitted that he understood the ramifications of his decision, and freely signed the waiver form.

In addition to this careful examination by the court, it is apparent from the transcript of the hearing on defendant's motion for post-sentencing relief that defendant's trial counsel effectively advised him of the ramifications of waiving the jury for sentencing. At the hearing, defendant's trial counsel was questioned by the court regarding what specifically he said to defendant when discussing whether to waive the jury. Defendant's counsel responded:

"A. *** [T]he way it was put to [the defendant] was that in order for him to be found guilty, all twelve people had to find him guilty; *in order for him to receive the death penalty, all twelve people had to do that or he didn't receive it*. They had to find the factor." (Emphasis added.)

As is apparent from this quote above, defendant's trial counsel correctly apprised defendant of the consequences of waiving the jury for sentencing. Thus, we find defendant's argument to be meritless.

Defendant next argues that his trial counsel failed to investigate and rebut evidence that defendant had taught his stepson to harass and hate homosexuals. Further, defendant argues that it was error for the court to consider such evidence since it was unreliable. We disagree.

The evidence which defendant claims is unreliable and which his trial counsel should have rebutted involves the testimony of Stearns at the sentencing hearing. At the sentencing hearing, Stearns testified about defendant's feelings towards homosexuals and his history of harassing homosexuals. Over defendant's objection, Stearns stated that defendant tried to inculcate his attitude towards homosexuals in Rita's son:

"Q. [Prosecutor]: What did [defendant] tell you about [Rita's son] participating [in this harassment of homosexuals]?

A. [Stearns]: He said that he just took [Rita's son] out there with him because he wanted to show him how things was [sic] done and how he was going to break him in right.

Q. And what was [defendant] referring to?

A. Harassing homosexuals.

Q. And did he ever specifically say that he had allowed [Rita's son] to go out on one of these outings?

A. Yes, he did."

Defendant argues that the evidence at a capital sentencing hearing must be both relevant and reliable. (See *People v. Harris* (1989), 129 Ill. 2d 123.) Defendant maintains that these statements by Stearns are unreliable, and that his trial counsel could have rebutted these statements by calling Rita's son and his biological father, Michael Hayward.

We disagree. At the hearing on defendant's post-sentencing motion, the court was confronted with the same argument defendant raises before this court. The trial court held an evidentiary hearing in which both Rita's son and Hayward testified. Rita's son testified on direct examination that defendant had never taught him to harass or assault homosexuals. On cross-examination, however, he admitted that defendant frequently bragged to him about harassing homosexuals. Further, Rita's son stated that on at least one or two occasions defendant and Rita took him with them to harass homosexuals at Crab Orchard Lake, and that he might have seen them swing a baseball bat. Hayward testified that his son has never displayed feelings of hatred towards homosexuals, and that he has never mentioned that defendant encouraged such feelings.

The testimony of Hayward and of Rita's son indicates to us that Stearns' testimony was reliable. Both Rita's son and Stearns testified that Rita's son was present during defendant's acts of violence towards homosex-

uals, and that defendant frequently bragged about his violence towards homosexuals in his presence. Hayward's testimony does not contradict this conclusion, and only suggests that Rita's son has not been turned into a "gay-bashing homophobe" despite defendant's attempts. Therefore, we find defendant's argument that the court relied on unreliable evidence in sentencing defendant to death is meritless.

Defendant's next argument is that the trial court erred in failing to appoint new counsel to represent defendant in his post-trial motion alleging ineffective assistance of counsel. At the conclusion of the guilt phase of the trial, defendant filed a *pro se* motion for a new trial alleging, *inter alia*, ineffective assistance of counsel. Defendant's trial counsel immediately filed a motion to withdraw as defendant's counsel, which was denied by the court. In his *pro se* motion for a new trial, defendant argued that his trial counsel was incompetent for failing to call several witnesses defendant claims would have provided valuable evidence for the defense. Specifically, defendant argued that his trial counsel should have called: Larry Beard, Karen Alexander, Mike and Kathy Wentworth, and Chuck Hooker.

During a preliminary consideration of defendant's motion, the court listened to defendant's arguments as to why these witnesses should have been called as well as defense counsel's explanations for not calling them to testify. Based on this preliminary hearing, the court ordered that an evidentiary hearing be held, at which the court would examine defendant's allegations only with respect to Beard and Alexander. The court believed that defendant's allegations of incompetence regarding the Wentworths and Chuck Hooker were meritless and pertained only to matters of trial strategy. Subsequently, at the evidentiary hearing, the court ordered defendant's trial counsel to question Beard and Alexander.

Defendant now argues that it was error for the court to allow his trial counsel to examine Beard and Alexander at the evidentiary hearing. In support of his argument, defendant cites *People v. Krankel* (1984), 102 Ill. 2d 181. In *Krankel*, this court found that the failure to appoint new counsel to argue the defendant's *pro se*, post-trial motion alleging ineffective assistance of counsel was error and remanded the cause for a new hearing on the ineffective-assistance-of-counsel issue. In *Krankel*, defendant's trial counsel failed to present an alibi defense, or to contact an alibi witness suggested by the defendant. In interpreting *Krankel*, our appellate court has concluded that there is no *per se* rule that new counsel must be appointed every time a defendant presents a *pro se* motion for a new trial alleging ineffective assistance of counsel. (See *People v. Bell* (1990), 197 Ill. App. 3d 613; *People v. Washington* (1989), 184 Ill. App. 3d 703; *People v. Generally* (1988), 170 Ill. App. 3d 668; *People v. Jackson* (1985), 131 Ill. App. 3d 128.) Rather, to determine whether new counsel should be appointed, "the trial court should examine the factual matters underlying the defendant's claim[.] \*\*\* [I]f the claim lacks merit or pertains to matters of trial strategy, then no new counsel need be appointed[, but] if the allegations show possible neglect of the case \*\*\* new counsel [should] be appointed." *Washington*, 184 Ill. App. 3d at 711.

We agree with the appellate court's interpretation of *Krankel*. If the trial court conducts a preliminary investigation of the defendant's allegations and determines them to be spurious or pertaining only to trial tactics, no new counsel should be appointed to represent the defendant. If, however, the defendant's allegations of incompetence indicate that trial counsel neglected the defendant's case, the court should appoint new counsel to argue defendant's claims of ineffective assistance of

counsel. In this case, new counsel should have been appointed to question Beard and Alexander at the evidentiary hearing. Prior to the evidentiary hearing, the court stated that if Beard's and Alexander's testimony is as defendant claims it will be, and trial counsel knew about this testimony and still failed to call the witnesses, defendant might have a valid claim for ineffective assistance of counsel. Yet, the court ordered defendant's trial counsel to question the witnesses who would ultimately prove whether he was, in fact, incompetent. This is a conflict of interest and, in essence, defense counsel was forced to argue his own incompetence at the hearing.

Nonetheless, we agree with the State that the trial court's failure to appoint new counsel was harmless beyond a reasonable doubt. (See *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229.) Defendant claimed that Beard and Alexander would have testified that Boyer told them she had lied to the police and at trial. At the evidentiary hearing, the court allowed the prosecutor and defense counsel to question the witnesses, allowed defendant to submit any questions he wanted to ask the witnesses, and asked the witnesses numerous questions itself. The court then determined that the witnesses' testimony was not in accord with defendant's representations, and denied defendant's *pro se* motion alleging ineffective assistance of counsel. After reviewing the transcript of the evidentiary hearing, we agree with the trial court's conclusion that the witnesses' testimony was inapposite to defendant's representations. Thus, we believe that the trial court's failure to appoint new counsel to argue defendant's *pro se* motion alleging ineffective assistance of counsel was harmless beyond a reasonable doubt.

We now consider defendant's remaining arguments regarding the constitutionality of the Illinois death penalty statute (Ill. Rev. Stat. 1987, ch. 38, par. 9—1). As to

each of defendant's arguments, we reaffirm our prior holdings that the Illinois death penalty statute is not unconstitutional.

Defendant first argues that the death penalty statute violates due process for failing to require that the State prove beyond a reasonable doubt that there are no mitigating factors sufficient to preclude the imposition of a death sentence. We have recently addressed this issue in *People v. Bean* (1990), 137 Ill. 2d 65, 138. In *Bean,* we stated, "at the second stage of a death penalty hearing a weighing of aggravating and mitigating factors presented by the State and defendant is to occur, and the State has no burden of proving that the weight of these factors is such that a death sentence should be imposed." *People v. Bean* (1990), 137 Ill. 2d 65, 138; see also *People v. Free* (1983), 94 Ill. 2d 378, 421.

Defendant next argues that the Illinois death penalty statute is unconstitutional because after the defendant is found eligible for the death penalty, it places the burden on the defendant to prove that death should not be imposed. Again, this argument was recently addressed by this court and rejected. In *Bean,* this court stated that placing a burden of persuasion on defendant to produce evidence of mitigating factors is constitutional. *Bean,* 137 Ill. 2d at 139; see also *People v. Whitehead* (1987), 116 Ill. 2d 425, 465; *People v. Olinger* (1986), 112 Ill. 2d 324, 352.

Lastly, defendant argues that the Illinois death penalty statute is unconstitutional because it does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences. Defendant lists seven features of the death penalty statute which he claims individually or in their totality render the statute unconstitutional. These seven factors are: (1) prosecutorial discretion in deciding whether to seek the death penalty, (2) the absence of a requirement for pretrial notice that capital

punishment will be sought, (3) the "limited comparative proportionality review" conducted by this court, (4) the absence of a requirement for written findings by the sentencer, (5) the absence of pretrial notice of the aggravating factors that will be alleged, (6) the absence of a burden of proof on the prosecution, (7) and a preclusion of the sentencer's consideration of the exact range of sentences applicable if the death penalty is not imposed. Each of these features listed by defendant have been considered individually and in totality, and have been found not to render the Illinois death penalty statute unconstitutional. See *People v. Phillips* (1989), 127 Ill. 2d 499, 543 (and cases cited therein).

For the reasons set forth above, we affirm the defendant's convictions and sentence of death, and hereby direct the clerk of this court to enter an order setting Wednesday, September 11, 1991, as the date on which the sentence of death entered by the circuit court of Williamson County shall be carried out. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 119—5). The clerk of this court shall send a copy of the mandate to the Director of Corrections, the warden of Stateville Correctional Center, and the warden of the institution where the defendant is confined.

*Affirmed.*

JUSTICES CALVO, BILANDIC and HEIPLE took no part in the consideration or decision of this case.